**Richard Anthony HOOTS, Appellant,**

v.

**Harry ALLSBROOK; Attorney General of the State of North Carolina, Rufus L. Edmisten, Appellees.**

No. 84–6724.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 10, 1985.

Decided March 5, 1986.

Robert S. Boyan (Boyan, Nix & Boyan, High Point, N.C., on brief), for appellant.

Barry S. McNeill, Asst. Atty. Gen., Raleigh, N.C., for appellees.

Before PHILLIPS and ERVIN, Circuit Judges, BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

Richard Hoots was convicted by a jury of armed robbery, and sentenced by a North Carolina state court to forty years imprisonment. Following exhaustion of direct appeal and post-conviction state remedies, Hoots filed a petition for a writ of habeas corpus in federal district court, claiming that he was deprived of his sixth amendment right to counsel because of ineffective assistance of counsel. The district court denied the petition. We affirm.

I

At approximately 11:00 p.m. on Tuesday, July 24, 1979, the Pizza Hut restaurant in Thomasville, North Carolina, was robbed by two men. One robber, Jeff Hayes,[1] went to the cash register and removed approximately $500. The second robber wielded a "black powder" pistol. Four persons witnessed the crime: Shirley Karen Roark, an assistant manager; Linda Barnes Davis, a waitress; and Christopher Hall and Jeff Goins, both customers.

Shortly after Hayes and the other robber left the restaurant, Officer T.W. Sells and Detective Bill Thomas, members of the Thomasville Police Department, arrived separately. Roark described both robbers to Sells. Thomas observed that the Pizza Hut dining room was dimly lit but that the area in which the robbery took place was bright. Roark also described the suspects to Thomas. The waitress, Davis, described the gunman, and identified the other robber as Hayes, who was apparently a former restaurant employee. The police officers filed an investigation report that recounted the on-scene descriptions by the robbery witnesses.

Following further police investigation, Hoots was arrested and indicted for armed robbery. Wilson O. Weldon, Jr. was appointed to represent him as an indigent. Weldon obtained a reduction in bond that permitted Hoots to secure release, obtained continuances of the trial, interviewed several potential witnesses, and consulted the police investigation report.

Weldon's planned defense of Hoots included the theories of alibi, misidentification, and third-party commission of the crime. Hoots' claim that he received inef-

---

**1.** Hayes has made several confessions in which he admitted his participation in the robbery, and entered a plea of no contest when charged with the robbery.

fective assistance of counsel is based on inadequate presentation of the misidentification and third-party commission theories. Specifically, the claim is that Weldon failed to conduct an investigation sufficient to discredit the state's sole identification witness, and did not investigate or present evidence that another party, Darrell Shaw, rather than Hoots, was the gunman.

To consider the claim, it is necessary to describe the proceedings that have preceded this appeal. After his first trial ended in a mistrial, Hoots has raised his sixth amendment claims by direct appeal, in two state court collateral proceedings and appeals therefrom, and before the federal district court in this proceeding.

Hoots' first trial ended in a mistrial when the jury could not reach a verdict. Three witnesses had testified for the state. Karen Roark, the Pizza Hut assistant manager, identified Hoots as the gunman.[2] She testified that the gunman was 5'6" to 5'8" tall, weighed 180–185 pounds, had blondish kinky, but not curly, hair, and wore a green scarf on his face, a dark shirt, and white pants. She stated that the lighting in the kitchen area of the restaurant, where she was located, was brighter than elsewhere in the restaurant, that she had lengthy eye contact with the gunman, that she was approximately fifteen feet from the robber, and that the gunman's scarf was sufficiently sheer that she could discern the robber's facial features. She testified that she recognized Hoots because he had spoken to her while he paid his bill at the restaurant several days earlier.

Officer Sells testified that Roark had described the gunman as 5'7", 190 pounds, with short blond hair. Sells stated that there were other witnesses to the robbery. Detective Thomas testified that Roark described the gunman as 5'5", 185 pounds, with blond curly hair and a scarf.

At this first trial, Weldon produced six alibi witnesses who testified that Hoots was at home the night of the robbery.[3] Jerry Harper, Cindy Ridge, and Lavada Meade also testified for Hoots. Harper testified that Hayes and Darrell Shaw visited his apartment on the night of the robbery, that they borrowed a pistol earlier that day, and that Hayes and Shaw left at 10:40 p.m. Harper described Shaw as 5'5", 178 pounds, with thin blond balding hair and a thick mustache extending almost to his chin. Meade testified that he saw Hayes and Shaw together both before and after the robbery. The court sustained the state's objection to Meade's proffered testimony that he heard Hayes and Shaw planning the robbery. Ridge stated that she was with Meade when they saw Hayes and Shaw after the robbery, and that Hayes and Shaw appeared nervous and sweaty. Hoots did not testify.

At Hoots' second trial, Roark and Detective Thomas again testified for the state and gave essentially the same testimony as that given at the first trial. Weldon cross-examined Roark about variations in her earlier descriptions of the gunman. Roark was shown a photograph of Shaw at the second trial, but denied ever having seen Shaw and noted that he had a mustache but that the man she saw did not. Officer Sells was unavailable for the second trial, but his testimony at the first trial was introduced.

Weldon again called several alibi witnesses. In addition, Don Thompson, Hoots' employer, testified that Hoots called in sick on July 22, did not work on the 23rd or 24th, and returned to work on July 25. Officer Terry Arney of the Thomasville Police Department testified that Jennifer Hoots, then appellant's girlfriend, told him Hoots was ill in bed on the day of the robbery. Jerry Harper and Ridge testified as they

2. The court suppressed as unduly suggestive two photographic identifications of Hoots by Roark, but admitted the in-court identification upon a ruling that it had an independent basis. Roark had previously identified Hoots at a preliminary hearing.

3. The district court found that most of these witnesses had a reason to be biased in favor of Hoots, and that only Hoots' girlfriend, Jennifer, now his wife, testified specifically that Hoots was at home at the exact time of the robbery.

had at the first trial. Meade did not testify at the second trial. Indeed, Weldon did not attempt to introduce evidence of the planning of a robbery by Hayes and Shaw, believing that he had no good faith basis for such an attempt because the same trial judge had ruled the evidence inadmissible at the first trial. Again, Hoots did not testify.

The jury found Hoots guilty, and he was sentenced to a term of 40 years imprisonment. Weldon was appointed to represent Hoots on appeal, but Hoots secured private counsel. On direct appeal, the North Carolina Court of Appeals affirmed Hoots' conviction, *State v. Hoots*, 50 N.C.App. 418, 274 S.E.2d 404 (1981), rejecting, *inter alia*, Hoots' claim of ineffective assistance of counsel. Hoots' appeal to the North Carolina Supreme Court was dismissed for lack of a substantial constitutional question. *State v. Hoots*, 302 N.C. 399, 279 S.E.2d 354 (1981).

Hoots then sought post-conviction relief in the state courts raising the ineffective assistance of counsel claim. An evidentiary hearing was provided. Hoots presented a number of witnesses. Linda Barnes Davis, the Pizza Hut waitress who had not testified at the trials, testified that the gunman wore a dark long-sleeved top and white pants, and had sandy brownish hair that hung out on the right side of his head. She stated that she thought the gunman had a dark cloth object covering his entire head. The two restaurant customers who witnessed the robbery also testified for the first time. One recalled that the robbers wore scarves or toboggans, but he only saw their backs, and could not make out features. The other could recall only that the robbers had on scarves or stockings.

Hoots also presented several witnesses to buttress his theory that a third party had been the gunman. Lavada Meade, who had testified at the first trial but not the second, recalled the conversation between Hayes and Shaw on the evening of July 24

in which they appeared to plan the robbery. Cindy Ridge testified that Meade had told her of the Hayes-Shaw conversation. Janice Harper (the sister of Jerry Harper) stated that she saw Hayes and Shaw on July 24 when they borrowed her brother's gun. She recalled that Shaw wore light pants, a black t-shirt, and had long sandy blonde or light brown hair. She stated that she later found a note from Hayes with $20, in which Hayes expressed the sentiment that he wished he could give her more money. Two gunshop employees testified that Hayes had been in the store several times during July, but they did not specifically remember that Hoots had accompanied Hayes.

Finally, Attorney Weldon testified at the post-conviction hearing. He recounted the conflicts he had had with Hoots and his father over the conduct of the case. He related that he reviewed the police investigation report, and on that basis had chosen not to interview or subpoena the witnesses whom the report stated could not have identified Hoots. He said that he had not introduced other evidence at the second trial, such as the testimony of the gunshop employees and Meade,[4] because he felt that the trial judge would abide by his ruling in the first trial that evidence of third-party commission of the crime was inadmissible. Weldon admitted that he had not investigated Roark's criminal record of forgery arrests and worthless check convictions, and had failed thereby to impeach the state's identification witness.

The state trial court denied post-conviction relief based upon findings of fact and conclusions of law. The court found that Weldon had been successful in obtaining a reduction in Hoot's bail, and in securing continuances of the trial to attempt to obtain the presence of Hayes, who was out of state. The court found that Weldon subpoenaed numerous witnesses, presented Hoots' alibi defense at the second trial, and presented all evidence in the light most

**4.** Meade also had a criminal record, and would have been subject to impeachment if called at the second trial.

favorable to Hoots. The court also determined that the lighting in the Pizza Hut was such that Roark had advantages that made her testimony more reliable than that of the robbery witnesses not called by Weldon. The state court found that the other evidence not presented or investigated by Weldon was either not probative or did not exclude Hoots as a participant in the robbery, and that Weldon was therefore justified in relying on the ruling in the first trial that such evidence was inadmissible. The court found no prejudice in the failure of Weldon to impeach Roark by her worthless check convictions. The North Carolina Court of Appeals denied Hoots' petition for review.

Later, Hoots again sought and was denied post-conviction relief in the state courts. In that second post-conviction proceeding, Hoots sought relief on the basis of newly discovered evidence that was claimed to exculpate him as the gunman.

This newly discovered evidence claim was based on the theory that the robbery was committed by Hayes and Shaw, and that Hoots was not a participant. Following the denial of Hoots' first motion for appropriate relief, Hayes had been arrested in Illinois and extradited to North Carolina. In Illinois, he had confessed to a police officer that he had robbed the Pizza Hut together with Shaw. In this statement, Hayes exonerated Hoots. Later, on March 26, 1984, Hayes had made another statement to a North Carolina law enforcement officer in which he reiterated his Illinois confession that exonerated Hoots. Still later, however, on April 7, 1984, after being told that a polygraph test showed deception, Hayes recanted his March 26 statement that had exonerated Hoots. This recanting statement of April 7 implicated both Hoots and Shaw, describing Hoots as the gunman and Shaw as the driver of the vehicle in which the robbers fled the Pizza Hut. The statement also asserted that Hayes feared reprisal against himself and

his child from Hoots' family. At the post-conviction hearing, Hayes once again changed his position. This time, under oath, he recanted the April 7 statement and reembraced the March 26 statement exonerating Hoots. This testimony repeated, however, Hayes' claim that he was concerned about reprisal from the Hoots family.

The state trial court concluded after receiving testimony from Hayes and other witnesses that Hayes' hearing testimony was unreliable and did not provide a basis for a new trial on the ground of newly discovered evidence. Also rejected as unreliable and, in any event, not probative of Hoots' non-participation was the testimony of Joyce Pegues that Shaw had made statements to her that implicated Shaw as the robber. The court concluded that even if reliable, the Pegues testimony only pointed to the participation of Shaw, which would not be inconsistent with the presence of Hoots as well. On this basis, the court ruled that the newly-discovered evidence about Hayes and Shaw did not justify a new trial under state law, and denied the requested relief. The North Carolina Court of Appeals affirmed the denial, finding that the lower court did not abuse its discretion, and that its conclusions were supported by substantial evidence. *State v. Hoots*, 76 N.C.App. 616, 334 S.E.2d 74 (1985).

Following denial of his first motion in state court for post-conviction relief, Hoots petitioned the federal district court for a writ of habeas corpus raising his claim of ineffective assistance of counsel in his state trial.

Hoots' petition was referred to a magistrate who made findings and recommendations for denial of the writ that were affirmed by the district court.[5]

This appeal followed.

5. An evidentiary hearing was not conducted in the district court. The magistrate concluded that the record before it, including transcripts and records of the state trials and hearings, made a new evidentiary hearing unnecessary. Hoots does not challenge on appeal this conclusion of the court.

## II

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that a convicted defendant claiming ineffective assistance must establish two things. First, that the counsel's performance was deficient, and second, that the deficient performance prejudiced the defense. *Id.* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Because we conclude that Hoots has not satisfied the second prong of the *Strickland* test by establishing prejudice, we affirm the judgment of the district court that Hoots did not receive ineffective assistance of counsel.

Hoots has advanced three possible bases for a finding that he was deprived of effective assistance. First, he claims that Weldon inadequately investigated the defense of misidentification because Weldon neither interviewed nor subpoenaed the robbery eyewitnesses other than Roark. Second, he asserts that Weldon should have researched the criminal background of Roark and used her record of worthless check convictions to impeach her credibility as the state's sole eyewitness. Third, he argues that Weldon prejudiced his defense by failing to investigate the third-party commission defense and by not attempting to raise the defense at Hoots' second trial.

We consider these in order.

### A.

■ The district court found that Weldon's failure to interview and use the witnesses to the robbery who could not identify Hoots, namely, Davis, Hall, and Goins, did not prejudice the defense. This federal finding accords with the conclusion of the North Carolina state courts in their ruling on Hoots' first post-conviction proceeding. We are nevertheless not bound by the determination of the state court and the district court that Hoots was not prejudiced, for that conclusion represents a mixed find-

ing of law and fact on the ultimate issue of whether Hoots received effective assistance. We freely review that ultimate determination on the basis of the habeas record. *See Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700; *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Knight v. Johnson*, 699 F.2d 162, 166 (4th Cir.1983).

We are bound, however, by the state post-conviction court's basic factfindings as to the circumstances surrounding the identification of Hoots and the presentation by Weldon of the misidentification defense.[6] Hoots has not urged that he did not receive a full, fair, and adequate hearing in state court on these matters, and we cannot conclude upon the record that the state court's findings were not fairly supported.

The state court found that Weldon reviewed the police investigation report, and Weldon testified that on the basis of that review he made a strategic decision not to call the eyewitnesses who could not identify Hoots because he felt he could make a stronger case by emphasizing that of all the witnesses to the robbery, only one could identify Hoots. The district court found evidence in the record to support Weldon's claim that he pursued this strategy at the second trial.

■ Ordinarily, courts considering a claim of ineffective assistance should not second-guess strategic decisions of counsel. *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 694–95. In particular, a "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Giving Weldon's decision not to carry his investigation of possible eyewitness testimony past a review of the police report the proper amount of deference, however, we would be inclined to find that his performance in this respect

---

**6.** Though the performance and prejudice components of the ineffectiveness injury are viewed as mixed questions of law or fact, *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070, 80 L.Ed.2d at 700, historical facts determined in the course of deciding a claim of ineffective assistance remain subject to the deference commanded by 28 U.S.C. § 2254(d) (1982). *Id.*

was sufficiently deficient to satisfy the first prong part of the *Strickland* test. Neglect even to interview available eyewitnesses to a crime simply cannot be ascribed to trial strategy and tactics. Here, Weldon's conceded basis for foregoing any interview with three of the four witnesses to the robbery was simply that solely on his reading of a police report he concluded that interviews were not warranted.

■ Assuming deficiency of representation in this respect, we pass to the prejudice inquiry. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. As to that, the test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. Specifically, we assess whether, if Weldon had interviewed the other robbery witnesses and on that basis had determined to offer their testimony and had then done so, it is "reasonably likely" that their testimony would have caused a different result. *Id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. We conclude that it would not have, and on that basis find the prejudice prong of the *Strickland* standard not met.

The state's identification case was completely dependent upon the testimony of Karen Roark. Roark was standing in the kitchen area of the restaurant throughout the robbery, and that part of the restaurant was better lighted than the areas in which Davis, Goins, and Hall, the non-testifying eyewitnesses, were. The state post-conviction court found as fact that the relative locations of and lighting available to the four witnesses made the gunman "more readily identifiable" to Roark. Roark's testimony at the second trial contained an unshakable identification of Hoots, buttressed by her claim that she

had seen him only several days earlier at the Pizza Hut. As their post-conviction proceeding testimony revealed, the other three witnesses would not have testified that Hoots was not the gunman, but would only have stated that they could not identify the gunman at all. Had Davis, Goins and Hall testified to that effect at the trials, the prosecution would undoubtedly have argued that the lighting advantages available to Roark explained her ability and the inability of the other three witnesses to make a positive identification. This, indeed, was advanced by the prosecution at the second trial as an explanation for the failure of the other robbery witnesses to make a testimonial identification of Hoots.

Davis' post-conviction affidavit showed that had she testified at trial she presumably would have differed from Roark in her description of the type of headcovering worn by the gunman, and Hall and Goins' testimony would presumably also have varied to some extent from Roark's on that point,[7] but we cannot determine that these presumed discrepancies in detail of description give rise to a "reasonable probability" that Hoots would not have been found guilty had the other eyewitnesses actually testified. Though the fact was disputed by Davis, Roark testified that she had lengthy eye contact with the gunman. None of the other witnesses would have testified affirmatively that Hoots was not the gunman. We are bound by a state court finding that Roark enjoyed unique lighting advantages, and must presume that the state would effectively have explained the discrepancies on that commonsense basis in conjunction with the ordinary confusion of eyewitness description of any fast-moving event. Finally, the jury had been apprised of a theory that Shaw was the gunman, had heard Shaw described by Jerry Harper as having a thick mustache, and had listened to Roark, in cross-examination, af-

7. Roark testified that the gunman wore a green scarf on his face, and that the scarf was sufficiently sheer in the light to permit her to discern facial features. Davis said the gunman wore a cloth that covered his entire head, but that hair protruded out one side of the covering. Hall said the gunman "appeared" to be wearing a stocking or hose over a section of his head and face. Goins' affidavit recited that the gunman wore a dark scarf that was not sheer.

firmatively assert that the gunman did not have a mustache, and that Shaw, shown to her in a photograph, was not the gunman.

On this basis, we conclude that Hoots has not shown that his attorney's failure to interview and use the potential testimony of eyewitnesses to the robbery sufficiently prejudiced him, and we therefore hold that in this respect he was not deprived of the effective assistance of counsel. *Strickland*, 466 U.S. at 691–93, 104 S.Ct. at 2067, 80 L.Ed.2d at 693.

### B.

Weldon conceded that he did not make inquiries that would have led him to the discovery of Roark's criminal record. Roark had been arrested and convicted on numerous worthless check charges, and had two felony arrests for forgery that resulted in misdemeanor convictions for obtaining goods with worthless checks. Hoots maintains that this criminal record should have been discovered and used to impeach Roark, and that Weldon's failure to impeach the state's only identification witness by her criminal record constituted ineffective assistance of counsel.

 We agree that defense counsel ordinarily has a duty to investigate possible methods for impeaching prosecution witnesses. That obligation was breached by Weldon, who did not even attempt to search out Roark's criminal record, which would have been easily discoverable.[8] In some cases such deficient performance might be so prejudicial to a criminal defendant that the *Strickland* standard for ineffective assistance of counsel would be satisfied. We do not think that can be found here, however.

Had Roark been convicted of perjury or another crime that directly called into question the reliability of her testimony, we might find that Hoots had shown a reasonable probability that but for the failure to impeach, the outcome of the trial would have been different. The failure to use worthless check convictions to impeach Roark does not give rise to a comparable implication of Roark's testimonial untrustworthiness, however.

Given the vagaries of attempts to impeach with matters collateral to testimonial trustworthiness, we simply are not able to declare that the failure to impeach by that means here gives rise to the reasonable probability that had it been done Hoots would not have been convicted. It all depends so strongly upon the impression of testimonial trustworthiness being otherwise conveyed by testimonial content and witness demeanor, and by the degree to which by her demeanor and appearance a witness may have developed general jury sympathy. On the record, Roark was a good, positive witness, who cogently explained the basis for her identification. It is of course possible that impeachment might sufficiently have shaken her credibility to tip the reasonable doubt balance. It is at least equally possible, however, that the attempt to impeach by this collateral means would have been viewed by the jury as an unwarranted, desperate effort to discredit a witness whose testimony was intrinsically and by demeanor wholly credible. Under *Strickland*, a mere possibility that the result might have been different does not suffice. We cannot say that this failure to impeach undermines our confidence in the result, however it may draw in question counsel's industry and acumen in fully developing a basis for defense of this client.

 Finally, we examine the contention by Hoots that Weldon inadequately investigated and presented the defense that Shaw was the gunman and that Hoots was uninvolved in the robbery committed by Hayes and Shaw. At the first and second trials, Weldon introduced testimony by Jerry Harper that Hayes and Shaw were together at his apartment shortly before the robbery and that they borrowed a "black powder"

---

**8.** All of Roark's arrests and convictions occurred and were recorded in Guilford County, her county of residence.

pistol from him. Cindy Ridge testified at both trials that she was with Lavada Meade and saw Hayes and Shaw together before the robbery. At the first trial, however, the court ruled inadmissible evidence that Hayes and Shaw planned the robbery together. Hoots now claims that it was ineffective assistance for Weldon not to attempt to introduce the testimony of Meade at the second trial and for Weldon to fail to investigate and call Janice Harper as a witness for him. If called at the second trial, it is now revealed that Meade would have attempted to testify that he heard Hayes and Shaw plan the robbery in detail. If elicited, Ridge would have testified that she and Meade saw Hayes and Shaw together after the robbery, and that Meade told her of the planning conversation between Hayes and Shaw. Janice Harper would have told of the note and money left in her brother's apartment by Hayes.

The evidentiary ruling not challenged by Weldon at the second trial was based on a correct reading of North Carolina law, and Weldon's decision not to attempt to introduce inadmissible evidence at the second trial did not constitute ineffective assist-

ance of counsel. Evidence of the commission of a crime by a third party is admissible only if it "points unerringly" to the guilt of the third party and to the innocence of the accused. *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338, 346 (1981).[9] At best, the evidence that might have been introduced through Meade, Janice Harper, and Cindy Ridge at the second trial merely indicated that Shaw as well as Hayes participated in the robbery. It did not "point unerringly" to the guilt of Shaw rather than Hoots, for it did not exclude the possibility that Hoots was a third participant in the crime, and that he accompanied Hayes into the restaurant as the gunman while Shaw remained in the getaway vehicle.[10]

The jury had before it evidence that Hayes and Shaw were together shortly before and after the robbery, and that they had borrowed the probable robbery weapon from Jerry Harper. They also heard testimony by Roark that rejected Shaw as the gunman. The evidence excluded at the first trial, and that was never proffered by Janice Harper, would have been subject to exclusion at the second trial because it did not, as required by North Carolina law, point unerringly to the guilt of Shaw and

---

9. *See also State v. Foster*, 33 N.C.App. 145, 234 S.E.2d 443 (1977) (evidence showing that others were involved in crime did not exclude participation of defendant, and was therefore properly excluded); *State v. Vanderhall*, 30 N.C.App. 239, 226 S.E.2d 402, 404 (1976) ("points unerringly" standard). Hoots contends that the proper statement of North Carolina law is now found in *State v. Makerson*, 52 N.C.App. 149, 277 S.E.2d 869 (1981). In *Makerson*, the intermediate North Carolina court adopted a more lenient test for the relevancy and admissibility of evidence showing the involvement of third parties in a crime. We conclude that *Vanderhall* and *Hamlette* represent the proper statement of North Carolina law. First, *Hamlette* is the most recent pronouncement of that state's highest court, and we presume that it remains authoritative. Second, the decision in *Makerson* by the North Carolina Court of Appeals does not cite *Vanderhall* or *Hamlette*, and thus cannot be seen as an extension or variation of the rule in those cases.

Moreover, for purposes of Hoots' claim of ineffective assistance, we note that *Makerson* was decided after the two trials of Hoots in 1980. At the time of Weldon's decision not to

introduce the third-party commission evidence, then, *Vanderhall* was unquestionably the North Carolina rule, and Weldon had no basis for challenging the trial court's proper ruling, under that law, made at the first trial. Hoots does not allege here that application of the North Carolina rule, to the extent it prejudiced him, worked an unconstitutional denial of due process.

10. We observe that the evidence considered by the North Carolina courts with regard to Hoots' second motion for post-conviction relief does not bear directly on Hoots' claim of ineffective assistance. In that most recent state proceeding, Hoots relied on statements by Hayes and Shaw made subsequent to the trials of Hoots in 1980. The state courts there concluded, however, that the inculpatory statements of Shaw did not exclude Hoots from participation in the robbery with both Hayes and Shaw, and one of Hayes' statements, though not the most recent, embraced a version of the robbery that included both Hoots and Shaw as participants. The North Carolina courts appeared to adopt the *Hamlette* rule, i.e., that the evidence of Shaw's involvement must be inconsistent with Hoots' participation in order to justify a new trial.

the innocence of Hoots. Hoots' claim of ineffective assistance as it pertains to this evidence therefore fails.

AFFIRMED.

ERVIN, Circuit Judge, dissenting:

I am unable to agree with the decision of the majority that Hoots was not deprived of his sixth amendment right to effective assistance of counsel. Thus, I would grant Hoots' petition for a writ of habeas corpus. For that reason, I respectfully dissent.

## I.

The majority has failed to properly apply the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) test to the facts of the instant case. Although I agree that attorney Weldon's failure to solicit testimony from other eyewitnesses and impeach Roark with her criminal convictions satisfied the first prong of the *Strickland* test,[1] I disagree with the conclusion that such unprofessional conduct did not meet the second prong.[2] The facts clearly warrant a finding that Weldon's deficient performance prejudiced Hoots' defense.

In applying the second prong of the *Strickland* test, the majority did not consider the accumulative effect of Weldon's two unprofessional errors. The majority evaluated the errors separately and determined that each one did not independently create a reasonable probability that but for the specific error, a different jury verdict would have occurred. *See* Majority Opinion at 1219–21.[3] *Strickland* requires that this court consider together all of counsel's deficiencies in determining "reasonable probability."[4] To do otherwise, as has the majority, results in treating the two attorney errors upon which Hoots relies for his petition for writ of habeas corpus, as two separate petitions.

## II.

Under a proper application of *Strickland*'s second prong, there is a reasonable probability that, but for Weldon's two unprofessional errors, the result of the proceeding would have been different. The jury would have found Hoots innocent.

The key witness for the prosecution was Karen Roark. As the majority stated, the state's case against Hoots was *completely* dependent upon Roark's testimony. She was the only witness who identified Hoots as the gunman. Thus, evidence contradicting and discrediting Roark's testimony would have put doubts in the jurors' minds as to the identity of the gunman. There is a reasonable probability that these doubts would have resulted in an acquittal of Hoots.[5]

Evidence contradicting Roark's testimony could have been obtained through the testimony of the other three eyewitnesses to the robbery. Roark had testified that she recognized the gunman as being Hoots because he wore a sheer green scarf only across his face and thus she could discern his facial and hair features. She described his size, hair color, and affirmatively as-

---

**1.** The first prong is whether counsel's performance was deficient. *Strickland,* 466 U.S. at 686–88, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 693.

**2.** The second prong is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

**3.** Hoots relied upon three errors committed by Weldon to illustrate the ineffective assistance: (1) failure to interview and use at trial the other eyewitnesses; (2) failure to impeach Roark;

and (3) failure to introduce evidence on the third party commission of crime defense. The majority applied the reasonable probability test two times; once to error (1) and once to error (2). The test should have been applied only once, to errors (1) and (2) conjunctively. I do agree, however, with the majority's opinion regarding error (3). *See* Majority Opinion at 1221–23.

**4.** Indeed, in enunciating the second prong of the *Strickland* test, the court used the plural of "error." *See supra* footnote 2.

**5.** The state had to prove Hoots' guilt beyond a reasonable doubt.

serted that he had no mustache. Roark also stated that she never lost eye contact with the gunman. This testimony would have been disputed by the other eye-witnesses.

Davis, Goins and Hall would have testi-fied that the gunman and his features were not identifiable because of the covering over his face *and* head. Davis would have claimed the gunman had eye contact with her. Such corroborating evidence raises substantial doubt about Roark's testimony regarding the face covering and her ability to see any characteristics of the gunman. In addition, a single eyewitness's positive identification of a gunman is seriously questioned when three other eyewitnesses cannot detect even a single facial feature.

Evidence of the three eyewitnesses' ina-bility to make out the gunman's facial char-acteristics would have refuted Roark's pos-itive assertion that the gunman did not have a mustache. Conflicting evidence as to the gunman's facial hair, coupled with the testimony disputing Roark's positive identification, could have led to Hoots' ex-oneration.

Substantial evidence at trial implicated another man, Darrell Shaw, as the gunman. He had the same body size, hair color, and clothing on the date of the robbery as the gunman at the Pizza Hut. Moreover, the undisputed evidence showed that Shaw and Hayes, the other Pizza Hut robber, were together shortly before and after the rob-bery and had borrowed the gun used in the crime. Shaw, however, had a mustache. This feature directly conflicted with Roark's description of the gunman and thus implied Shaw's innocence. Hoots, however, met Roark's description (i.e., he was similar in size and hair color and had no mustache).

In finding Hoots to be the gunman, and not Shaw, the jury gave more weight to Roark's undisputed testimony than to the other evidence implicating Shaw.[6] If Da-vis, Goins, and Hall had testified that the

gunman's facial features were not discern-able, it is reasonably probable that the jury, in rendering its verdict, would have doubted Roark's description and identifica-tion of the gunman, thereby relying more on the evidence against Shaw and Hoots' alibi.

The majority contends that the testimony of Davis, Goins, and Hall would have been discounted because the lighting where Roark was positioned was better than the lighting where the other three witnesses were located. This distinction in lighting is not significant enough to presume the jury would have considered Roark's testimony more reliable.

First, the lighting around the gunman, not the witnesses, is more important when discerning features through a covering. An effective counsel could have argued this point at trial. Moreover, the slight differ-ences in lighting cannot extenuate the sub-stantial discrepancies in the eywitnesses' testimony. Roark stated she could see that the gunman had blond kinky-like hair, as he was only wearing a facial covering. The other three witnesses would have stated unequivocally that the gunman had a cov-ering over his head. In addition, Roark stated that she never lost eye contact with the gunman. Davis, who was the same distance, but in a different direction, from the gunman as was Roark, would have testified that the gunman looked primarily at her (Davis) and only glanced occasionally at Roark.

These unexplained discrepancies would have required the jury to assess the credi-bility of Roark and the other three eye-witnesses. Considering the totality of the evidence and would-be evidence, it is proba-ble that the jury would have given little credibility to Roark's testimony. The cor-roborating testimony of three uninterested eyewitnesses appears to be more worthy of belief than the contrary testimony of a single witness. This is especially true when the single witness, like Roark, has

---

**6.** In addition to the previously discussed evi-dence directly implicating Shaw, Hoots also presented four alibi witnesses who testified that

Hoots was in bed sick in another town before and during the time of the robbery.

been convicted of criminal acts, which indicate her tendency to be dishonest and untruthful. As a result of this discrediting of the state's sole identification evidence, it is reasonably probable that the jury would have found the evidence insufficient to prove beyond a reasonable doubt that Hoots was the gunman.

The majority does not consider Roark's worthless check convictions as an implication of her testimonial untrustworthiness. I disagree. Intentionally cashing worthless checks is dishonest and deceitful. Indeed, this circuit has stated that convictions for cashing worthless checks under false pretenses or any other crimen falsi bears directly upon the witness's propensity to testify honestly and truthfully. *See United States v. Cunningham*, 638 F.2d 696 (4th Cir.1981).

The majority also underestimates the probative value of using Roark's criminal conviction to impeach her by speculating that the jury could have had a negative reaction to the impeachment. I do not believe the jury would have had such reaction. The majority's speculation is based on the assumption that Roark's identification testimony was credible and not contradicted by other evidence. Had Davis, Goins, and Hall testified, Roark's testimony would have become suspect, thereby raising doubts as to Roark's testimonial truthfulness. These doubts would have made the jurors more amenable to hearing impeaching statements against Roark.

In sum, Weldon's unprofessional errors were devastating to Hoots' defense. The testimony of Davis, Goins, and Hall would have contradicted the state's sole identification witness. This would have led the jurors to doubt the accuracy of Roark's description and identification of the gunman. The jury then probably would have given more weight to the other evidence, Hoots' alibi and Shaw's participation. These results, coupled with evidence (i.e., her criminal convictions) impeaching Roark's credibility, would have culminated in the prosecution's failure to meet its burden of proof. Thus, there is more than a reasonable probability that, but for the omission at trial of the testimony of Davis, Goins, and Hall and the proof of Roark's past criminal convictions, the jury would have found Hoots innocent of being the gunman at the Pizza Hut on the night of July 24, 1979. Accordingly, I would reverse the district court and grant Hoots' petition for a writ of habeas corpus.