**Elwood SMITH, Petitioner–Appellee,**

v.

**Robert SMITH, Superintendent; Attorney General of the State of N.C., Respondents–Appellants.**

No. 90–7096.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1991.

Decided April 23, 1991.

Clarence Joe DelForge, III, Asst. Atty. Gen., argued (Lacy H. Thornburg, Atty. Gen., Richard N. League, Sp. Deputy Atty. Gen., on brief), Raleigh, N.C., for respondents-appellants.

Clela Margaret Errington, argued (John W. Gresham, on brief), Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., Charlotte, N.C., for petitioner-appellee.

Before SPROUSE, Circuit Judge, DUPREE, Senior District Judge for the Eastern District of North Carolina, sitting by designation, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.

SPROUSE, Circuit Judge:

In this appeal, we review a Sixth Amendment claim of ineffective assistance of counsel raised by defendant, Elwood Smith, who had been convicted in state court of murder and assault. He exhausted his state appeals and was denied post conviction relief in the state court. However, the federal district court granted his petition for a writ of habeas corpus, finding that Smith had received ineffective assistance of counsel. We reverse.

I

On the evening of November 10, 1978, Terry Jewett and Gary Stratton went to the Fonz Club, in Charlotte, North Carolina. After spending some time inside the Club, the two exited to its parking lot with another couple—Debra Sloan and Perry Short. There, the four stood around a car consuming alcoholic drinks.[1] At approximately 10:00 p.m. an assailant opened fire on the group, killing Stratton and seriously wounding Sloan. After the police arrived, Terry Jewett immediately approached an officer, M.M. Stevens, and informed him that the defendant Smith had done the shooting. Stevens, who knew Smith well, contacted another police officer, D.L. Case, who advised that he had just seen Smith at a store three or four blocks from the Fonz Club. Officer Stevens then drove toward that store and, while en route, spotted Smith driving a tan, off-white hatchback. Stevens stopped Smith,[2] questioned him, and brought him back to the Fonz Club, where Jewett positively identified him as the assailant and he was arrested. He was subsequently indicted for murder.

At trial, Jewett testified that on the night in question she heard one shot, looked up, and saw Smith standing at the corner of the Fonz Club pointing a long-handled gun at them. According to Jewett, Stratton then pushed her off to the side of the car and fell on top of her. Jewett also testified that she had lived with Stratton for two-and-one-half years and that he had fathered her son. Stratton and Jewett, however, terminated their relationship and the latter began a "stormy" relationship with Smith.[3] Shortly before the night of the shooting, however, Jewett separated from Smith and renewed her relationship with Stratton. Smith requested that Jewett return to him, but she refused. Enraged, he purportedly warned Jewett that Stratton had better "look out" for him.

At trial, Debra Sloan, the other person who had been shot, testified that when the shooting started she immediately looked up and saw "fire" coming from the corner of the Fonz Club, but that she could not see who was firing the shots. She explained that Perry Short had thrown her to the ground before she had a chance to look.

Another witness, who was in the back seat of a car in the parking lot of the Fonz Club during the shooting, testified that a few minutes before the shooting she saw a

---

1. Perry Short testified that the four had also smoked marijuana; Jewett denied using the drug.

2. When Stevens stopped Smith, he found a .22 caliber bullet sitting on the console of the car. Police criminologists, however, failed to link the shell casings found at the murder scene with the bullet discovered in the car.

3. Jewett twice swore out warrants against Smith for assault. She testified that on one occasion defendant shot at her in her apartment with a .22 caliber rifle. The police who arrived on the scene took a .22 caliber Winchester semi-automatic rifle from defendant and turned it over to defendant's wife. Sometime later, Jewett found the .22 caliber shell casing from the shot fired and kept it. Approximately one week after the shooting at the Fonz Club, she gave this casing to the police, who compared it with the shell casings found at the crime scene. They matched.

cream colored hatchback drive into the parking lot and that the driver of the car looked like Smith.

Officer Stevens testified that he apprehended Smith within blocks of the Fonz Club, that Jewett positively identified Smith as the assailant when he brought the defendant back to the parking lot, and that Smith, on the night of his arrest, had attempted to escape through the ceiling of the Charlotte Law Enforcement Center.[4] A firearms expert testified concerning eleven shell casings. Ten had been found at the scene of the murder. The other shell had been given to the police by Jewett, who explained that she had retained it after a previous shooting encounter with Smith. The expert indicated that all eleven shells had been fired from the same weapon and that the groove markings were consistent with being fired from a .22 caliber Winchester semi-automatic rifle.

Smith's defense rested on the testimony of a single alibi witness, Kim Kennedy. She testified that on the night of the shooting Smith picked her up at approximately 7:15 p.m. at a hospital, where she was visiting her sick nephew. She stated that she drove with Smith and her friend, Arlene Clark, and an unidentified male to a diner. At around 9:30 p.m., they left the diner and drove to a pool hall. Kennedy testified that she left the pool hall around 10:05 p.m. and that Smith was still inside.

In response to Kennedy's testimony, the state recalled Officer Stevens, who testified that after Smith had been arrested, the latter protested that he had been at the homes of two friends, a Mitch Tickle and a Tony Bullock, and that he had not mentioned a pool hall.

Smith was convicted by a jury and sentenced to concurrent terms of life imprisonment for the murder of Stratton and ten to twenty years for the assault of Sloan. His conviction was affirmed by the Supreme Court of North Carolina. *State v. Smith*, 299 N.C. 533, 263 S.E.2d 563 (1980). After he exhausted his appeals, Smith filed a Motion for Appropriate Relief in state court contending, in part, that he had been denied effective assistance of counsel because his attorney failed to call Perry Short as a witness. After a full hearing, the Mecklenburg County superior court denied his motion. Thereafter, he filed a writ of habeas corpus in federal district court. After oral argument, the district court granted the writ and ordered Smith to be discharged from custody unless the state provided a new trial within 120 days. It is that ruling which the state appeals.

## II

In order to establish ineffective assistance of counsel, Smith must, of course, prove both that: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced his defense by creating a reasonable probability of a different result. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Concerning the first prong, the district court found, and the state virtually concedes, that defense counsel's performance fell below an objective standard of reasonableness. The district court based its decision on the "extremely short amount of time [counsel] put in on all pretrial matters" and his failure to interview possible witnesses—principally Perry Short. It is unnecessary for us to decide whether the defense counsel's performance herein fell below an objective standard of reasonableness, for we are persuaded that he was not prejudiced by his counsel's actions.

In order to prove prejudice, Smith must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. As we have stated, Smith's principal contention of ineffectiveness is his coun-

**4.** Smith took a chair, which had been bolted to the floor, ripped it loose and used it to knock a hole in the concrete and wire reinforced ceiling. He attempted to escape through this hole, but was apprehended.

sel's failure to call Short as a witness. He argues that the state centered its case on the testimony of Jewett and that Short's testimony would have undermined the credibility of her statements—creating a reasonable probability that the jury would have reached a different result.

Although Short did not testify at trial, he did testify at the state evidentiary hearing on Smith's Motion for Appropriate Relief. There, he related that he was in the Fonz Club parking lot consuming alcoholic drinks and smoking marijuana with his three companions at the time of the shooting. According to his testimony, when the shots were fired he looked directly at the gunman, but it was too dark to identify the person firing the shots. Short also testified that at the police station after the shooting Jewett told him that she "bet" Smith did the shooting and that "she knew it had to be [Smith]"—apparently suggesting that she was not certain who really did the shooting.

The district court found that had Short's putative testimony been offered, there was a reasonable probability that the jury would have reached a different result and that the failure to present this testimony "undermine[d] confidence in the outcome." We disagree for several reasons.

First, several witnesses for the state testified that flood lights from a Winn Dixie parking lot, located across the street from the Fonz Club, and other neighboring lights provided sufficient illumination to observe events that transpired in the Fonz Club parking lot. Second, Short's testimony contradicts the statement he gave police on the night of the shooting, in which he stated that he "did not see where the shots came from but [was] positive they were fired from a hiding place behind the lounge." Third, Short acknowledged that after the shooting both he and Smith were incarcerated together in the same cell in the Mecklenburg County jail and acknowledged that he had discussed the case with him.[5] Short also provided defendant with an "affidavit" while they were in Central Prison together, stating that it was too dark that night to see who did the shooting and that "[s]o far as my testimony I think you have the wrong man." Short, however, later contradicted this affidavit statement at the state evidentiary hearing, where he testified that he "assumed" Smith did the shooting. Finally, Short was not a credible witness. The state did not have him testify because he was "entirely disreputable," and the record supports that judgment. Short had been convicted of drug possession, possession of a needle and syringe, distribution of marijuana, armed robbery, felonious breaking and entering and assault with a deadly weapon on a law enforcement officer.

In our view, presenting Short as a defense witness subject to cross-examination by the prosecution would have weakened rather than strengthened Smith's defense. The judgment of the district court is therefore reversed.

REVERSED.

---

**5.** Sometime after the shooting, Short was arrested for armed robbery. The record does not indicate the length of time the two spent together in the same cell, but it may be significant that Smith was described at oral argument as large and muscular.