62 F.3d 1414
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Cary McKenzie BRIGMAN, Petitioner-Appellee,
v.
Aaron J. JOHNSON; Lacy H. Thornburg, Attorney General of
North Carolina, Respondents-Appellants.
 No. 94-6564.
 United States Court of Appeals, Fourth Circuit.
 Aug. 4, 1995.
 
 Clarence Joe DelForge, III, North Carolina Department of Justice, with him on the brief, Michael F. Easley, Atty. Gen., Richard N. League, Sp. Deputy Atty. Gen., North Carolina Department of Justice, Raleigh, NC, for appellants.
 James Phillip Griffin, Jr., North Carolina Prisoner Legal Services, Inc., with him on the brief, Paul M. Green, Raleigh, NC, for appellee.
 Before ERVIN and MICHAEL, Circuit JJ., and MESSITTE, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 This appeal arises from the district court's issuance of a writ of habeas corpus on the grounds of ineffective assistance of counsel and unconstitutional suppression of evidence. Brigman filed this habeas petition while serving his twenty-five year prison sentence for a second-degree murder conviction. Prior to filing this petition, Brigman had exhausted his direct appeals as well as his collateral attacks in the North Carolina state court system. Brigman initiated this federal proceeding in October 1991 and, upon the recommendation of the magistrate judge to whom the petition had been referred, the district court issued a writ of habeas corpus on April 13, 1994. For the reasons stated below, we reverse the issuance of the writ.
 
 I.
 
 2
 The central dispute at trial was whether Brigman acted in selfdefense when he shot Phillip Anderson after the two men had a heated verbal exchange in a church parking lot. The confrontation had begun earlier in the evening at a convenience store, when Brigman, who is white, and Anderson, who is black, exchanged racial epithets and insults. Brigman conceded at trial that, in many ways, he was the primary instigator of the violence. After it appeared that the two men had finished insulting one another in the church parking lot, as Brigman was preparing to drive away, he backed up his truck to ask Anderson whether he would enjoy getting beaten up. The evidence demonstrates that soon after levying this final insult, Brigman shot Anderson four times, with the last shot fired well after Anderson had been struck by the first barrage. The defense produced no evidence to explain why Brigman deemed it necessary to fire on Anderson a fourth time.
 
 
 3
 A jury convicted Brigman of second-degree murder on October 12, 1983, and Brigman spent the next eight years seeking relief in North Carolina state courts. In November of 1984, the North Carolina Court of Appeals affirmed Brigman's conviction, and four years later Brigman filed a pro se motion for relief in Gaston County Superior Court. That court granted Brigman a post-conviction hearing, which was held on September 25, 1989. Relief was denied on February 23, 1991, and one month later the North Carolina Court of Appeals denied review.
 
 
 4
 Brigman initiated this collateral attack in federal district court in August 1991. The district court referred the habeas petition to a magistrate judge, who--on his own initiative--leveled six independent criticisms against Brigman's trial counsel, Stephen Dolley:
 
 
 5
 1. Error to replace Warshawsky, assistant defense counsel with a black attorney, Harris, who had not previously worked on the case.
 
 
 6
 2. Failure to interview decedent's brother who had been shot by the decedent two weeks prior to the BrigmanAnderson gunfight.
 
 
 7
 3. Failure to use the Gordons, witnesses at the crime scene, as trial witnesses.
 
 
 8
 4. Failure to develop adequately evidence pertaining to decedent's violent character. 5. Failure to use Brigman's aunt and uncle as witnesses in order to bolster Brigman's claim of self-defense and to undermine Kenneth Anderson's testimony.
 
 
 9
 6. Failure to request jury instruction on duty to retreat.
 
 
 10
 The magistrate judge issued a memorandum recommending that the writ be granted on the grounds of ineffective assistance of counsel and unconstitutional suppression of evidence. In a one paragraph opinion, the district court adopted the magistrate judge's recommendation in its entirety and granted Brigman's petition for a writ of habeas corpus. The state of North Carolina appealed. Jurisdiction in this court is proper under 28 U.S.C. Secs. 1291 and 2254.
 
 II.
 
 11
 The individual components of our ineffective assistance inquiry are mixed questions of law and fact, Strickland v. Washington, 466 U.S. 668, 698 (1984), that are subject to de novo review on habeas appeal. Turner v. Williams, 35 F.3d 872, 887 (4th Cir.1994) (citing Miller v. Fenton, 474 U.S. 104, 112 (1985)), cert. denied, 115 S.Ct. 1359 (1995). "Historical facts determined in the course of deciding a claim of ineffective assistance remain subject to the deference commanded by 28 U.S.C. Sec. 2254(d) (1982)." Hoots v. Allsbrook, 785 F.2d 1214, 1219 n. 6 (4th Cir.1986).
 
 
 12
 At trial, the central issue was whether Brigman or Phillip Anderson was the aggressor in the 1983 shooting. On appeal, we must determine whether Brigman's trial counsel made a sufficiently effective attempt at demonstrating that his client had acted only in self-defense. According to the district court, there are six different ways in which Brigman was deprived of effective assistance of counsel. Upon close examination of the record, we conclude that each criticism of trial counsel raised sua sponte by the magistrate judge was unwarranted or, at the very least, failed to account for reasonable strategic moves by trial counsel. In either case, the district court's issuance of the writ is inconsistent with Strickland and its progeny.
 
 
 13
 "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir.1991) (quoting Strickland, 466 U.S. at 686), cert. denied, 112 S.Ct. 3056 (1992). Strickland announced a two-part test for evaluating a lawyer's effectiveness. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 687-88. We have specified that the standard of reasonableness is to be evaluated under "prevailing professional norms." Clozza v. Murray, 913 F.2d 1092, 1097 (4th Cir.1990), cert. denied, 499 U.S. 913 (1991). Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; Smith v. Smith, 931 F.2d 242, 244 (4th Cir.1991). These two components are typically referred to as Strickland 's "performance" and "prejudice" components. Strickland, 466 U.S. at 698; United States v. Hoyle, 33 F.3d 415, 418 (4th Cir.1994), cert. denied, 115 S.Ct. 949 (1995); Smith, 931 F.2d at 244.
 
 
 14
 Not all deficiencies in a counsel's performance rise to the level of constitutional significance under Strickland. Unless Brigman can demonstrate that his counsel's performance was deficient and that the deficient performance prejudiced the defense, he should not be afforded habeas relief. Hoots, 785 F.2d at 1219; see also United States v. Tatum, 943 F.2d 370, 375 (4th Cir.1991) ("To be constitutionally significant, a deficiency in counsel's performance must have a prejudicial effect on the defense of the case."). Brigman's task is made even more difficult insofar as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. The substantial deference that must be afforded trial counsel in his strategic decisions severely undermines Brigman's chances of having his habeas relief sustained on appeal. "Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689; Lockhart v. Fretwell, 113 S.Ct. 838, 844 (1993).
 
 A.
 
 15
 Courts considering claims of ineffective assistance of counsel are not to second-guess strategic decisions of counsel, Strickland, 466 U.S. at 689-90, particularly when those decisions relate to the issue of whether defense counsel conducted an adequate investigation. See also Bunch, 949 F.2d at 1363 (noting that "when evaluating decisions not to investigate further, we must regard counsel's choice with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments' ") (quoting Strickland, 466 U.S. at 691); cf. Turner, 35 F.3d at 896 (in the context of ineffective assistance of counsel claims, "we address not what is prudent or appropriate, but only what is constitutionally compelled"). Three of the six criticisms that Brigman levels against his trial counsel relate to shortcomings in Dolley's investigative procedures.
 
 
 16
 With respect to one of these--the failure to interview Anderson's brother, George--Brigman argues at this stage that he "does not contend that the failure to interview George Anderson and present his testimony by itself satisfies Strickland 's second prong of prejudice to the defense, but it does add to the context of generally inadequate preparation for trial."* Petitioner's Br., at 22. At the 1989 state court hearing, Dolley testified that, at the time of trial, he had known George Anderson was prepared to testify that Phillip had shot him in the stomach accidentally two weeks prior to Phillip's death. George Anderson's own testimony at the 1989 hearing relating to his and Phillip's altercation with two bikers supported Dolley's claim that Phillip's shooting of George had been purely accidental:
 
 
 17
 [T]here was a scuffle that broke out and my brother grabbed him [one of the bikers] by the arm and somehowI suppose my brother suspected he might have a gun or weapon of some kind inside his jacket.... [T]he only thing I knew was that they [Phillip and the biker] were scuffling with the gun. I got out of the car and walked around to the side of the car
 
 
 18
 and asked them to put the gun down before somebody gets hurt. About that time it went off.
 
 
 19
 Joint Appendix, at 401. Dolley's decision not to call George Anderson as a witness can reasonably "be considered sound trial strategy." Jones v. Murray, 947 F.2d 1106, 1113 (4th Cir.1991), cert. denied, 503 U.S. 973 (1992). We recently recognized that" [a] claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." Turner, 35 F.3d at 898. Anderson's testimony would not have been helpful. Nothing from his state court testimony remotely suggests that he viewed his being shot by his brother as anything but a complete accident.
 
 
 20
 The second investigative failure relates to information possessed by the Gordons, a husband and wife, who were the first persons to arrive at the scene of the shooting. Although it is possible that the Gordons might have testified that they had seen Anderson's own gun lying on the ground--suggesting that Anderson was the first to brandish a gun--defense counsel had more definitive statements to this effect from Officers Hayes and Redding. As a result, any testimony the Gordons could have offered would have been "merely cumulative of testimony actually presented during [Brigman's] trial." Jones, 947 F.d at 1113. We find it to have been acceptable trial strategy for Dolley not to call the Gordons as witnesses, because they were also likely to testify on cross-examination about the condition of the victim's body. Such testimony would have been far more damaging to Brigman than any benefit he might have gained by virtue of the couple's likely repetition of the officers' testimony. Again, this is a judgment call on the part of defense counsel, and neither Strickland nor subsequent decisions of this circuit suggest that defense counsel should be secondguessed on such matters on appeal. Hoots, 785 F.2d at 1219.
 
 
 21
 Brigman also complains about Dolley's lack of effort in investigating four potential witnesses--Roberts, Johnson, Ross, and George Anderson--who could have testified regarding decedent's reputation for violence. At the 1989 state court hearing, Roberts admitted only to knowing about the decedent's reputation for violence in 1981, two years prior to the 1983 shooting. Johnson's testimony was no more helpful, because he was only able to cite one instance, in 1981, when the decedent allegedly brandished a gun. Another witness, Ross, could have been the most useful witness, because he claimed to have witnessed Anderson brandishing a gun the very day of the shooting. Unfortunately for the defense, Ross also carried the most liabilities as a witness, because he was a convicted felon who would have been very susceptible to impeachment. The fourth and final "reputation" witness was Anderson's brother, George, whose story would not have been any help to the defense. As stated above, George made it very clear during the 1989 state court hearing that he believed that his brother had shot him in the stomach by accident when the two were involved in a scuffle with bikers. His testimony at the 1983 trial would not have helped defense counsel prove that the decedent was prone to violence.
 
 
 22
 While defense counsel did not interview those four men, Dolley did speak with Anderson's employer, to another security guard, and to two secretaries at his place of business. In addition, Dolley inquired about the incident involving Anderson and his brother, as well as Anderson's police record.
 
 B.
 
 23
 We are most troubled by the district court's decision to base the issuance of the writ, in part, on the fact that Dolley added an AfricanAmerican attorney, Harris, to the defense team on the first day of trial. Brigman grossly exaggerates the role Harris played at trial. See Petitioner's Br. at 14 ("[T]he first thing lead counsel did was to replace his second chair with another lawyer who knew nothing about the case.") (emphasis added). No one replaced Warshawsky as second chair on the defense team; Dolley simply chose to add another attorney to the team in light of the racial animus that engendered the underlying violence in this case.
 
 
 24
 Brigman mischaracterizes the effect that bringing Harris aboard had upon Warshawsky's role. Nothing in the record suggests that Warshawsky was "dismissed" as Brigman claims. See Petitioner's Br. at 15 ("[I]t was professionally unreasonable to dismiss, at the last minute, the attorney who had done the most to prepare the case for trial."). It is true that Warshawsky was the primary researcher and gatherer of evidence, but it is equally clear that Dolley was the more experienced litigator and always had intended to serve as lead counsel. In addition, Brigman offers no evidence that Harris' responsibilities at trial included items that would have otherwise been left to Warshawsky had Harris not been asked to come aboard. Finally, it is not as if Harris was given significant responsibilities the day of trial--he was asked only to examine character witnesses. All critical courtroom decisions were made by Dolley.
 
 
 25
 Ironically, Brigman never claimed at trial that the addition of a third attorney to his defense team would lessen his chances for acquittal. In fact, when asked at the September 25, 1989 post-conviction hearing whether he had approved of lead attorney Dolley's lastminute decision to add Harris to the defense, Brigman testified that "I told Mr. Dolley that he was my lawyer and that whatever he thought was best to do it." Joint Appendix, at 466. We find it to have been a perfectly rational move on Dolley's part to add an AfricanAmerican lawyer to Brigman's team.
 
 C.
 
 26
 Although Dolley never requested an instruction regarding the duty to retreat, the instructions pertaining to self-defense offered at trial provided Brigman with virtually the same degree of protection. The "duty to retreat" instruction is best reserved for those cases in which violence occurs in the home or place of business. See, e.g., Taylor v. Starnes, 650 F.2d 38, 40 n. 7 (1981). Any help that Brigman could have received from a jury instruction existed by virtue of the selfdefense instruction:
 
 
 27
 The defendant would be excused of first-degree murder and second-degree murder on the grounds of self-defense if, first, it appeared to the defendant and he believed it to be necessary to shoot Phillip Anderson with a pistol in order to save himself from death or great bodily harm, and, secondly the circumstances, as they appeared to him at the time, were sufficient to create a belief in the mind of a person of ordinary firmness.... [T]he defendant would not be guilty of any murder ... if he acted in self-defense as I have just defined it to you, and if he was not the aggressor in bringing on the fight and did not use excessive force under the cir cumstances. If the defendant, voluntarily and without provocation, entered the fight, he would be considered the aggressor unless he thereafter attempted to abandon the fight and gave notice to the deceased that he was doing so.
 
 
 28
 Joint Appendix, at 279. The jury apparently concluded that Brigman had not acted in self-defense and had, to some extent, instigated the violence. An instruction regarding an individual's duty to retreat would not have saved Brigman from the second-degree murder conviction.
 
 
 29
 After considering each of the criticisms levelled by the magistrate judge and then adopted by Brigman, we conclude--as we did in Bunch--that "counsel made reasonable professional judgments and did not render unconstitutionally defective assistance of counsel." Bunch, 949 F.2d at 1365. Brigman has not shown that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.
 
 III.
 
 30
 Brigman's unconstitutional suppression argument regarding the state's failure to release the Gordons' statements about the location of Anderson's gun until after trial mirrors Brigman's claim of ineffective assistance of counsel. Brigman concedes that he is entitled to a new trial only where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 557, 682 (1985). Recently, in Kyles v. Whitley, 131 L.Ed.2d 490 (1995), the Supreme Court emphasized that the question under Bagley is whether, in the absence of the suppressed evidence, the habeas petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 506. In many respects, this is the same standard we applied in the Strickland context--i.e., whether mistakes that were made prejudiced the petitioner.
 
 
 31
 We have already concluded that the Gordons' statements about where Anderson's gun was located at the scene of the crime merely would have been cumulative and would not have influenced the trial's outcome. The suppression of the Gordons' testimony did not violate Brady v. Maryland, 373 U.S. 83 (1963), primarily because "the failure to disclose did not undermine confidence in the verdict." United States v. Curtis, 931 F.2d 1011, 1014 (4th Cir.), cert. denied, 502 U.S. 881 (1991); Bagley, 473 U.S. at 678. In Curtis, the Court recognized that "[w]hen assessing the possibility of a different outcome, the reviewing court should consider the totality of the circumstances." Curtis, 931 F.2d at 1014. Here, we do not find that there is a "reasonable probability" that a different result would have been reached had the suppressed evidence been presented at trial. Id.
 
 IV.
 
 32
 Brigman's counsel spent in excess of 200 hours preparing this case for trial. Sixteen witnesses were subpoenaed by the defense, and nine ultimately testified at trial. While another attorney might have made different strategic decisions, we cannot find that Dolley's decisions fell below the level of acceptable conduct required under Strickland. The district court's issuance of the petition for habeas corpus relief is accordingly
 
 
 33
 REVERSED.
 
 
 
 *
 As is the case with most of the criticisms of Dolley's trial performance, it was the magistrate judge, not Brigman, who claimed that defense counsel's failure to interview the brother of Brigman's victim was an oversight of constitutional proportions