John Norman HUFFINGTON, Petitioner–Appellant,

v.

Eugene NUTH, Warden; Attorney General of the State of Maryland, Respondents–Appellees.

No. 96–7930.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 29, 1998.

Decided March 31, 1998.

**ARGUED:** Jon Steven Baughman, Ropes & Gray, Washington, DC, for Appellant. Gwynn X. Kinsey, Jr., Assistant Attorney General, Criminal Appeals Division, Office of the Attorney General, Baltimore, MD, for Appellees. **ON BRIEF:** David Overlock Stewart, Ropes & Gray, Washington, DC, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, Office of the Attorney General, Baltimore, MD, for Appellees.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge MURNAGHAN and Judge NIEMEYER joined.

OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury found John Norman Huffington guilty of murdering two people on Memorial Day weekend in 1981. After pursuing direct appeals and seeking post-conviction relief from the state courts, Huffington petitioned for federal habeas relief. The district court denied his petition for a writ of habeas corpus, and we affirm.

I.

A.

On November 13, 1981, a jury convicted Huffington on two counts of felony murder and related offenses. All of the charges stemmed from the brutal murders of Joseph Hudson and Diane Becker in the early morning hours of May 25, 1981. The Maryland Court of Appeals reversed Huffington's conviction based on an evidentiary error unrelated to this habeas petition, and remanded for a new trial. *See Huffington v. State*, 295 Md. 1, 452 A.2d 1211 (1982).

At the second trial, a jury again convicted Huffington of two counts of felony murder and related offenses, and sentenced him to death. Huffington appealed once more, asserting a different evidentiary error. The Maryland Court of Appeals rejected the argument and affirmed. *See Huffington v.*

*State*, 304 Md. 559, 500 A.2d 272 (1985), *cert. denied sub nom. Huffington v. Maryland*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986).

Under Maryland law, Huffington could not raise a claim of ineffective assistance of counsel on his direct appeal. *See Johnson v. State*, 292 Md. 405, 439 A.2d 542, 559 (1982). He therefore filed a petition for postconviction relief with the Circuit Court for Frederick County. That court vacated his death sentence, but otherwise denied postconviction relief. Huffington thereafter filed an application to appeal the partial denial of postconviction relief. The Maryland Court of Appeals refused to grant his application for leave to appeal and his motion to reconsider that action. The Supreme Court denied his petition for certiorari. *See Huffington v. Maryland*, 502 U.S. 985, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991).

When the State elected not to seek the death penalty, the state trial court resentenced Huffington to consecutive life terms. He then filed a second application for state post-conviction relief, asserting a single argument: the denial of application for leave to appeal in his first state post-conviction proceeding violated his equal protection and due process rights. The state trial court denied his petition, and the Maryland Court of Special Appeals, after initially remanding for explication of the trial court's rationale, denied his application for leave to appeal.

In November 1994, Huffington filed an application for a writ of habeas corpus with the district court. A magistrate judge issued a report recommending denial of the writ. The district court, after conducting a *de novo* review and correcting certain legal errors, adopted the recommendation and denied the writ. Huffington then appealed to this court.

B.

At Huffington's trial, the State presented both direct and circumstantial evidence that Huffington killed Hudson and Becker. Deno Kanaras, who had already been convicted in connection with the murders, testified for the State at both of Huffington's trials. The

Maryland Court of Appeals recounted his testimony as follows.

[Huffington] spoke with Hudson at the Golden Forty [a nightclub where Hudson worked as a disc jockey] and arranged to make a cocaine purchase after the bar closed. On leaving the club, they [Kanaras and Huffington] followed Hudson and company to the camp ground [in Kanaras's car], stopping at the 7–11 on the way. At the trailer, [Huffington] spoke with Hudson about purchasing 3 1/2 grams of cocaine, and about arranging a subsequent deal for the remainder of Hudson's cocaine. [Huffington] purchased the 3 1/2 grams for $275, toward which Kanaras contributed $100. [Huffington] agreed to try to arrange a deal for the remainder of Hudson's cocaine, approximately another 3 1/2 grams, at a price of $350. Kanaras and [Huffington] then left the trailer and went to [Huffington's] apartment, arriving at about 3:30 a.m. At the apartment, Kanaras sat in the living room while [Huffington] went to the bedroom to make some telephone calls. [Huffington] subsequently returned and indicated that he had arranged a purchase. They returned to the campground where[Huffington] told Hudson he had a purchaser and also wanted to discuss a bigger deal later that evening. Hudson then got dressed and left a note on a counter in the trailer whereupon the three men left in Kanaras's car. [Huffington] gave directions to Wheel Road and instructed Kanaras to park the car in the driveway of an old farm. All three men got out of the car and walked up the driveway, Kanaras and Hudson walking side by side, [Huffington] following. Suddenly, Kanaras heard four or five gunshots and Hudson fell. [Huffington] reloaded the revolver, approached Hudson, and fired twice from close range into the left side of the head. Kanaras was so shocked he didn't know what to say. [Huffington] then rolled Hudson's body over and pulled a bag of cocaine out of his shirt pocket. Ultimately, [Huffington] placed this bag of cocaine into a Marlboro cigarette box. [Huffington] removed the bag from Hudson's pocket, turned to Kanaras, pointed the gun at him, and ordered him to drive

them back to the campground. [Huffington] said that Hudson had $2000 at the campground, which he wanted. At the entrance to the campground, [Huffington] directed Kanaras to park the car some distance from Hudson's trailer so it would not be seen and to leave the car unlocked with the keys in the ignition. [Huffington] also directed Kanaras to accompany him to the trailer. [Huffington] opened the door, which was unlocked, and they went in. Becker's son was asleep in the back of the trailer at the time. After [Huffington] picked up the note Hudson had left and put it in his pocket, they searched the trailer, and Kanaras found the money in a cabinet. [Huffington] then drew a knife out of his boot and told Kanaras to kill Diane Becker. Kanaras, shocked, said he could not kill her. [Huffington] then walked over toward the bed, picked up a bottle from the floor, and struck Becker five or six times in the back of the head. [Huffington] then took the knife and stabbed Becker repeatedly in the chest, back and throat. When [Huffington] finished stabbing Becker in the throat, Kanaras regained his senses and left the trailer. [Huffington] was fifteen or twenty feet behind. They ran to the car, [Huffington] carrying the bottle and a pocketbook. They then drove to [Huffington's] apartment.

At the apartment, [Huffington] changed clothes, and cleaned the gun, knife, and bottle with some rags. He counted the money and forced Kanaras to take $840, although Kanaras tried to refuse it. [Huffington] put his pants in the sink and poured bleach on them in an effort to clean out the bloodstains. Later, he put the pants into a bag and put the knife, bottle, and pocketbook into another bag. They then left the apartment, [Huffington] having ordered Kanaras to take him to the Fiddler's Convention. En route, they stopped by a creek at Harmony Church Road where [Huffington] threw the bottle into some brush, burned the pocketbook and note, and threw some live rounds of ammunition into the creek. They drove further to a location in Cecil County where [Huffington] dropped the knife and gun

into some stagnant water. Still terrified, being unsure whether [Huffington] possessed any further weapons, Kanaras drove [Huffington] to the Fiddler's Convention as directed. They walked around the Convention and Kanaras spoke with someone he knew. They left after an hour. Kanaras drove [Huffington] to Hall's Furniture Store in Aberdeen, where a friend of [Huffington's] would be working. At that time, [Huffington] threw the bag with the pants into a nearby dumpster. [Huffington] then went into the furniture store. Kanaras drove home.

*Huffington*, 452 A.2d at 1212–13 (quoting the agreed upon statement of facts); *see Huffington*, 500 A.2d· at 274. In addition to this account, Kanaras testified that he once owned the gun used in the murders, but that he had sold the gun to Huffington approximately five weeks prior to the murders—i.e., sometime in April.

The State did not rely entirely on Kanaras' testimony. Rather, it also presented a significant amount of circumstantial evidence substantiating Kanaras' account and linking Huffington to the murders. On May 26, the day after the murders, Kanaras directed the police to locations in the area surrounding Bel Air, Maryland. At one location the police fished out of a pool of water a gun, holster, knife, sheath, and several live rounds of .38 caliber ammunition. At a second location they recovered more live rounds of .38 caliber ammunition, the remains of a burnt pocketbook (including identification cards belonging to Becker), and a vodka bottle. At a third location, in a dumpster, they unearthed a brown paper bag containing a pair of corduroy pants that smelled of bleach. On May 27, the police searched Huffington's apartment, where they recovered a bottle of bleach from his night table and a pack of Marlboro cigarettes containing a small bag with a substance subsequently identified as cocaine.

At trial, the State presented testimony regarding the evidence just detailed, as well as evidence collected from Becker's trailer and from the location around Hudson's body. According to a Federal Bureau of Investigation (FBI) ballistics expert, spent shell casings found near Hudson's body were fired from the gun found in the water, and the bullets that killed Hudson could have been fired from that gun. Further, an FBI chemical composition analysis expert determined that samples of the ammunition collected from the remote locations showed "analytically indistinguishable" characteristics when compared with samples of the bullets retrieved from Hudson's body. The expert also testified that his experience indicated all of the bullets (except one, which represented a different version of a .38 caliber bullet) could have come from the same box of ammunition.

An FBI hair expert testified that hair samples taken from Becker's garter belt and blanket microscopically matched a known sample of Huffington's hair. An FBI fingerprint expert identified a fingerprint found on the vodka bottle as that of Huffington's right index finger. A serology expert testified that blood on the vodka bottle could have come from Becker, and that blood found on Huffington's boot could have been human blood. Chemical analysis verified that the substance found in the Marlboro cigarette box in Huffington's apartment was cocaine. *See Huffington*, 452 A.2d at 1213–14. Local police testified that Huffington fit into the recovered corduroy pants.

The police further explained that on May 26, Huffington made a voluntary statement indicating that he and Kanaras had remained at the Golden Forty until closing and then went directly to the Fiddler's Convention. When challenged, Huffington changed his statement to the police. He admitted going to the trailer with Kanaras to purchase drugs after the Golden Forty closed, but stated he then went with Kanaras to the Fiddler's Convention. Huffington denied, and continues to deny, that he participated in, or was even present during, the murders.

The State also submitted testimony from Huffington's then-girlfriend and a number of his acquaintances. The girlfriend, Kim Bognani, stated that Huffington came to her apartment on the evening of May 25 and, although he had never spoken of going to Florida prior to that night, asked her to go with him on a trip to Florida. They then

spent part of the evening investigating airline ticket fares. Bognani further testified that Huffington had some cocaine in a Marlboro box that evening, that he was known to possess a gun he allegedly obtained from Kanaras, and that she knew he owned a pair of corduroy pants like those found in the dumpster.

Testimony from acquaintances of Huffington indicated that they observed Huffington in possession of both the knife and the gun prior to the murders. One witness, James Brinegar, testified that he saw Huffington with the gun earlier that weekend. Another witness, Laura Nengel, stated that she saw the knife in Huffington's kitchen drawer in April.

## II.

Huffington principally contends that his trial attorney rendered ineffective assistance of counsel. The familiar performance and prejudice test enunciated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs this claim. First, Huffington must demonstrate that the performance of his trial counsel failed to meet an objective standard of reasonableness. Second, Huffington must also show that this failure resulted in prejudice.

■ The *Strickland* test seeks to root out deficient performance that renders a trial unfair to a criminal defendant. "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ...." *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305 (1986). The inquiry as to whether counsel rendered objectively reasonable assistance is necessarily deferential and depends upon the circumstances of the individual case. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. In fact, "to eliminate the distorting effects of hindsight," *id.* at 689, 104 S.Ct. at 2065, courts must evaluate the challenged performance "as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066. "[T]hat is, the defendant must overcome the presumption that, under the circumstances, the challenged ac-

tion might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

■ But even objectively unreasonable performance does not require a court to disturb a verdict unless the unreasonable performance has adversely affected the defense. Under the prejudice prong of *Strickland,* "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Given that the ultimate concern is the fundamental fairness and reliability of the outcome of the trial, when making the prejudice determination a court "must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. at 2069. Moreover, when evaluating prejudice a court may consider all aspects of the evidence proffered by the petitioner, including aspects both beneficial and detrimental to petitioner's case. *See, e.g., Whitley v. Bair,* 802 F.2d 1487, 1493–96 (4th Cir.1986) (any mitigating evidence that trial counsel might have developed would have been accompanied by aggravating evidence, and thus the alleged failure to develop the evidence did not result in prejudice).

■ Determinations regarding the effectiveness of counsel involve mixed questions of law and fact that we review *de novo. See Smith v. Angelone,* 111 F.3d 1126, 1131 (4th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 2, 138 L.Ed.2d 1036 (1997). A state court's determinations of historical facts, however, made after a hearing on the merits, are presumed correct, and the habeas petitioner bears the burden of establishing by convincing evidence that they are erroneous. *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (interpreting 28 U.S.C.A. § 2254(d) prior to its amendment by the Antiterriorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996)); *Savino v. Murray,* 82 F.3d 593, 598 (4th Cir.) (same), *cert. denied,* 518 U.S. 1035, 117 S.Ct. 1, 135 L.Ed.2d 1098 (1996); *see also Lindh v. Murphy,* — U.S. —, — — —, 117

S.Ct. 2059, 2063–68, 138 L.Ed.2d 481 (1997) (holding Antiterrorism and Effective Death Penalty Act—including the new "deference" standard applicable to state court determinations—does not govern habeas applications in non-capital cases pending when the Act was passed).

With this framework in mind, we turn to Huffington's claims.

#### A.

■ The first instance of alleged ineffective assistance involves a potential witness named Stephen Rassa. As noted by the Court of Appeals of Maryland, Rassa testified as a rebuttal witness for the State during its successful prosecution of Kanaras. *See Huffington*, 500 A.2d at 274. Rassa also testified at Huffington's state post-conviction hearing.

Rassa's testimony included accounts of past drug deals between Kanaras and Hudson, information that Kanaras owed Hudson money, and Rassa's recollection that approximately four days prior to the murders Kanaras discussed robbing Hudson. Rassa also recounted that Kanaras mentioned having a knife and a gun at the time, and that he thought Kanaras intended to kill Hudson. Huffington contends that this testimony would have severely impeached the credibility of Kanaras, especially given that Kanaras denied some of these allegations on cross-examination. *See id.* at 292–93 (McAuliffe, J., dissenting) (characterizing Rassa's testimony as crucial to impeaching Kanaras' testimony).

Huffington argues that Rassa's testimony would have proved critical to his defense strategy and that his counsel's failure to locate or subpoena Rassa until the first day of trial, or to make substantial efforts to find Rassa, amounts to ineffective assistance. In response, the State asserts that the state post-conviction court found that defense counsel's "efforts in regard to Rassa" constituted a tactical decision, to which we should defer. *See* Brief of Respondent at 18. Although the state post-conviction court made no such finding, the evidence supports that

conclusion, and so Huffington's argument fails.

Trial counsel testified at Huffington's post-conviction relief hearing that he decided not to subpoena Rassa until the start of trial for tactical reasons. He explained that he had the benefit of the transcript of Rassa's testimony at the Kanaras trial and the defense's investigative notes from Huffington's first trial. He worried about Rassa's stability and willingness to testify, and so did not attempt to contact Rassa until the second trial began. A letter from Huffington to trial counsel in 1983 indicates that Huffington concurred in this strategy; in the letter, Huffington conveyed his desire to keep the identity of defense witnesses from the State "until it's too late for the State to scare them away." Further, at the post-conviction hearing counsel stated that he and Huffington "discussed the potential problems in timing of subpoenaing" witnesses.

Additionally, the record shows that, although the effort failed, Huffington's trial counsel ultimately did hire an experienced former local police lieutenant to find Rassa. The lieutenant was probably unsuccessful because, as Rassa testified at the post-conviction hearing, at the time of Huffington's trial he had moved to California and his family had no idea where to locate him. Rassa explained that he had decided to avoid further embarrassment to his family in connection with the murders, and that he appeared at the post-conviction hearing only under threat of being forced to return in handcuffs.

The evidence above supports the conclusion that trial counsel made a tactical decision regarding *when* to subpoena Rassa; that his decision was consistent with Huffington's expressed concern about giving information to the State; that counsel ultimately took reasonable steps to locate Rassa, who was intent on avoiding participation; and that; viewed from counsel's vantage point at the time of trial, his tactical decision fell within the "wide range of professionally competent assistance" contemplated by *Strickland. See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66; *cf. Blair–Bey v. Nix*, 44 F.3d 711, 713 (8th Cir.1995) (holding counsel did not render ineffective assistance where "[c]oun-

sel's failure to locate the two witnesses was understandable because the witnesses did not want to be found"). Because trial counsel's performance with regard to Rassa did not fall below an objective standard of reasonableness, we need not address the prejudice prong of the *Strickland* test. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70.

### B.

■ Huffington next argues that trial counsel rendered ineffective assistance by failing to investigate, interview, and present defense witnesses helpful to his case. In particular, Huffington points to the assertedly essential testimony of five witnesses—Earl Thomas Wagner, Gary Aschenbach, Norris Huffington, Thomas Hall, and William Palmisano—who testified at his post-conviction hearing, some of whom he specifically asked his trial counsel to contact prior to trial.

■ *Strickland*'s objective reasonableness prong requires counsel to conduct appropriate factual and legal inquiries and to allow adequate time for trial preparation and development of defense strategies. *See Sneed v. Smith,* 670 F.2d 1348, 1353 (4th Cir.1982); *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.1968). Counsel must ordinarily "investigate possible methods for impeaching prosecution witnesses," and in some instances failure to do so may suffice to prove a claim under *Strickland. See Hoots v. Allsbrook,* 785 F.2d 1214, 1221 (4th Cir.1986).

■ The Sixth Amendment, however, does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony. *See LaGrand v. Stewart,* 133 F.3d 1253, 1274 (9th Cir.1998) (trial counsel need not interview witnesses where counsel is familiar with witnesses' account); *Turner v. Williams,* 35 F.3d 872, 896 (1994) (same), *cert. denied,* 514 U.S. 1017, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995), *overruled on other grounds by O'Dell v. Netherland,* 95 F.3d 1214 (4th Cir.1996), *aff'd,* — U.S. —, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997); *Eggleston v. United States,* 798 F.2d 374, 376 (9th Cir.1986) (same). In this case, Wagner, Aschenbach, Hall, and Norris Huffington all testified at the Kanaras trial. *See* Brief of Appellant at 15–16. Trial counsel had the transcripts from the Kanaras trial, as well as those from Huffington's first trial, so he generally knew the substance of their testimony.

■ Nevertheless, Huffington insists that his counsel's failure to contact these witnesses must constitute deficient representation. This and other courts have held an attorney's representation deficient when he failed to contact and interview important prospective witnesses, especially when they were readily available or had been identified by the defendant prior to trial. However, Huffington's reliance on these cases is somewhat misplaced. Most of them involve alibi witnesses or eyewitnesses critical to the determination of guilt, and none of Huffington's proffered witnesses fall into those categories. *See, e.g., Sanders v. Ratelle,* 21 F.3d 1446, 1456–58 (9th Cir.1994) (exculpatory witness); *Griffin v. Warden,* 970 F.2d 1355, 1358 (4th Cir.1992) (alibi witness); *Grooms v. Solem,* 923 F.2d 88, 90 (8th Cir.1991) (alibi witness); *Chambers v. Armontrout,* 907 F.2d 825, 829–32 (8th Cir.1990) (self-defense witness); *Lawrence v. Armontrout,* 900 F.2d 127, 129–30 (8th Cir.1990) (alibi witnesses); *Blackburn v. Foltz,* 828 F.2d 1177, 1182–83 (6th Cir. 1987) (alibi witness); *Hoots,* 785 F.2d at 1219–20 (eyewitness); *Nealy v. Cabana,* 764 F.2d 1173, 1177–78 (5th Cir.1985) (alibi witness); *Weidner v. Wainwright,* 708 F.2d 614, 616 (11th Cir.1983) (self-defense witnesses). Although "a lawyer's failure to investigate a witness who has been identified as crucial may indicate an inadequate investigation, the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *Gray v. Lucas,* 677 F.2d 1086, 1093 n. 5 (5th Cir.1982); *see Nealy,* 764 F.2d at 1178.

This standard would seem to apply particularly when the defendant himself denominates witnesses as just "character" witnesses, which is precisely what Huffington did. In a pre-trial letter to his counsel, Huffington (a seemingly savvy client) specifically characterized the witnesses he wanted contacted (including Wagner and Hall) as "character," not "alibi" or impeachment, witnesses. The Supreme Court has recognized

that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67. Thus, we cannot find error in the state post-conviction court's determination that Huffington's counsel made a reasonable tactical decision not to call character witnesses at the guilt stage of the trial.

In making the reasonableness determination, "we must appreciate the practical limitations and tactical decisions that trial counsel faced.... Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bunch v. Thompson,* 949 F.2d 1354, 1363 (4th Cir.1991) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066–67). Considering all of the circumstances of this case, defense counsel's failure to contact the witnesses Huffington identified did not constitute objectively unreasonable representation.

██ Even if counsel's failure to contact these five witnesses fell below a standard of objective reasonableness, Huffington's ineffective assistance claim still cannot succeed because the failure to contact these witnesses did not prejudice him. According to Huffington, Wagner, Maryland State Trooper Aschenbach, and Hall would have contradicted Kanaras, the principal government witness, and his father, Norris Huffington, would have further impeached Kanaras' credibility. Huffington maintains that Wagner would have testified that Kanaras was "hot" for cocaine and obsessed with money; that Kanaras had the gun well after he claimed to have sold the gun to Huffington; and that Kanaras owned a hunting knife like the one used in the murders. Huffington contends that Aschenbach would have similarly testified as to Kanaras' involvement with drugs and need for money, that he possessed a gun, and that he displayed violent tendencies. Huffington claims that Hall would have stated that Huffington had too little time to throw the bag containing the corduroy pants into the dumpster near Hall's family business, as Kanaras testified. Huffington's father would have testified that Kanaras had

an easy manner when they spoke on the morning of May 25, and that Kanaras waited for Huffington for forty-five minutes without leaving. This demeanor, Huffington insists, belies Kanaras' testimony that Huffington forced him along on these murders.

In fact, none of this testimony proves as compelling as Huffington suggests. Wagner's and Ashenbach's testimony as to Kanaras' obsession with drugs and his violent past essentially would have been cumulative. At trial, Kanaras acknowledged his drug abuse, his prior dealings with Hudson, and his convictions and life sentences for these murders. *See Hunt v. Nuth,* 57 F.3d 1327, 1333 (4th Cir.1995) (counsel's failure to obtain cumulative evidence does not demonstrate prejudice). Furthermore, their proffered testimony as to Kanaras' possession of a gun would not have conflicted with Kanaras' own account. Wagner asserted that Kanaras possessed a gun in late April or early May; Aschenbach testified that Kanaras had a gun in late March. Neither of these statements contradicts Kanaras' testimony that he owned the gun until he sold it to Huffington sometime in April.

Hall, Huffington's good friend—Huffington described Hall as his "main man"—merely speculated as to the timing issue:

> I was on the phone at the time [that Kanaras and Huffington drove up to the store] and I just glanced out and I saw the car and I continued with the conversation and I was on the phone, and about fifteen (15) or twenty (20) seconds later, you know, I heard the bell ring, and turned around and [Huffington] was in the store.

Hall's statement strongly suggests that he did not pay much attention either to Huffington's actions or to the time frame involved.

We must evaluate the testimony of Huffington's own father in light of the potential bias inherent in such testimony. *See Romero v. Tansy,* 46 F.3d 1024, 1030 (10th Cir. 1995) (testimony of defendant's family members is of less value than that of objective witnesses); *Gullett v. Armontrout,* 894 F.2d 308, 310 (8th Cir.1990) (testimony of wife "would in all probability not have changed the verdict of the jury given [her] ... obvious bias"). Even if fully credited, this testi-

582

mony indicates only that Kanaras may have been a more willing participant than he admitted. It does little, if anything, to undermine Kanaras' testimony as to Huffington's participation in the murders.

■ Nor do we find persuasive Huffington's argument that the testimony of William Palmisano could have rebutted the testimony of another government witness. Palmisano, a graduate biochemistry student who once lived with Huffington, assertedly would have refuted the trial testimony of Laura Nengel, the witness who testified that she saw the knife in Huffington's kitchen drawer in April 1981. Palmisano's testimony does conflict with aspects of Nengel's testimony. Nengel recounted that she saw the knife in Huffington's kitchen drawer in April 1981, and that the knife was purchased by Palmisano during an outing to Baltimore's Inner Harbor. Palmisano admitted that he went to the Inner Harbor with Nengel, but stated that a different friend purchased a knife that day. He also testified that the knife purchased was broken just a few days later.

This testimony conflicts with Nengel's account of how Huffington came into possession of the knife, even if it does not directly contradict her recollection of the knife's presence in Huffington's apartment. Nengel, however, was not an essential witness. The State's other evidence against Huffington was overwhelming. *See United States v. Prows,* 118 F.3d 686, 693 (10th Cir.1997) (holding trial counsel's failure to interview or call witness that could have discredited testimony of government witness not prejudicial where other "overwhelming evidence" existed). In light of the other evidence linking Huffington to the crimes, counsel's failure to obtain Palmisano's testimony does not raise a reasonable probability that undermines our confidence in the jury verdict. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

C.

Huffington also maintains that trial counsel failed to launch an adequate challenge to the State's physical evidence, and expert testimony interpreting that evidence. His argument centers on evidence and testimony re-

garding bullet composition, hair comparison, and fingerprint identification.

■ Huffington contends that counsel's failure to cross-examine the State's bullet composition expert, Donald Havekost, or to have his results confirmed by another expert, amounted to ineffective assistance. Havekost testified at trial that composition samples taken from the live ammunition and from bullets recovered from Hudson's body were "analytically indistinguishable," and that all but one of the bullets could have come from the same box of ammunition. In support of his argument, Huffington directs us to the post-conviction testimony given by Dr. Vincent Guinn, a metal composition expert, who described a number of asserted errors in Havekost's method of analysis.

The fundamental weakness in this argument lies in trial counsel's testimony that he chose not to attack this forensic evidence for strategic reasons. As the state post-conviction court found, his trial strategy involved asserting that Huffington was not even present during the commission of the crimes. In counsel's view, an attack on the reliability of the bullet composition testimony did not fit that strategy. This tactical decision, viewed from the vantage point of trial and not from hindsight, does not fall outside the wide range of reasonable discretion afforded to counsel. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70. Furthermore, Dr. Guinn never contested the actual results obtained by Havekost. Dr. Guinn criticized the methodology used to reach those results, and the propriety of drawing the conclusions Havekost drew. (Havekost also testified at the post-conviction hearing, disputing Dr. Guinn's criticisms and criticizing Dr. Guinn's method.) In view of Huffington's defense theory, we cannot conclude that failure to offer expert testimony similar to Dr. Guinn's prejudiced Huffington.

■ Huffington next challenges counsel's cross examination of the FBI hair expert, Michael Malone. Huffington complains of counsel's failure to obtain from Malone an admission that he never tried to microscopically match the hair collected from the crime scene with Dianne Becker's hair. Again, this failure does not amount to ineffective assis-

tance. Agent Malone's testimony was clear. Two hairs taken from Becker's garter belt and blanket microscopically matched samples of Huffington's hair. They did not microscopically match the known samples of Kanaras' or Hudson's hair, nor did they visually match Becker's hair, which was longer and of a different color. It is evident from this testimony, which Malone offered at trial, that he did not match the hair collected at the crime scene microscopically (rather than visually) with a sample of Becker's hair.

Moreover, on cross examination, Malone testified that microscopic hair analysis alone does not provide a sufficient basis to identify a person with positive assurance. Malone further acknowledged that the hair at the crime scene could have come from others with the same microscopic characteristics, although he noted it would be highly unlikely to find two persons with the same microscopic characteristics in such close proximity. Counsel also established that Malone did not test the hair of a man named David Britton, who had been at the trailer with Becker on the evening of the murders. In light of all of this testimony, counsel's failure to obtain the admission Huffington now asserts is so important did not result in prejudice to Huffington.

■ Additionally, Huffington cites trial counsel's failure to elicit the FBI fingerprint expert's inability to establish the exact time that Huffington left his fingerprint on the vodka bottle. Counsel did not cross examine this witness to obtain the testimony Huffington now desires; however, counsel did make this point in his closing argument. After conceding that Huffington visited the trailer that night, counsel emphasized that the State could only speculate as to the timing of the fingerprint. Counsel's closing argument, combined with the degree of common sense imputed to juries every day, *see, e.g., United States v. Mulderig*, 120 F.3d 534, 547 (5th Cir.1997) (acknowledging that a jury "may properly rely on their 'common sense' "), satisfies us that a failure to obtain evidence as to fingerprint timing did not constitute ineffective assistance of counsel.

### D.

■ Huffington alludes to two other asserted deficiencies by trial counsel. Huffington questions the assignment of the Kanaras cross examination to local co-counsel, Robert Rothenhoefer. Rothenhoefer had over twenty years of experience as a local county prosecutor. According to the post-conviction transcript, Rothenhoefer drew up twelve to fifteen pages of questions to impeach Kanaras' credibility. He questioned Kanaras for over an hour. This conduct does not fall below a measure of objective reasonableness.

■ Huffington also challenges trial counsel's waiver of his opening statement. Although it may be unusual to waive an opening statement, such a decision is essentially tactical in nature, and not objectively unreasonable. *See Nguyen v. Reynolds*, 131 F.3d 1340, 1350 (10th Cir.1997); *United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir.1985); *cf. Hunt*, 57 F.3d at 1332 (waiver of opening statement until after prosecution's case is essentially tactical decision within the wide range of reasonable attorney conduct).

### E.

Finally, Huffington maintains that, even if individually the above instances do not amount to ineffective assistance of counsel, collectively they do. *See Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir.1990) (evaluating cumulative effect of asserted errors); *Blackburn*, 828 F.2d at 1184 (analyzing overall attorney performance). However, the trial in this case contained few, if any, errors.

Viewing the evidence as a whole, including any errors, our confidence in the outcome of the trial remains undisturbed.

### III.

Huffington's remaining two arguments require less explication.

### A.

The first involves the state court's refusal to admit the transcript of Stephen Rassa's prior testimony. When it became apparent

that Rassa was unavailable to testify at Huffington's trial, Huffington moved to admit a transcript of Rassa's testimony at Kanaras' trial. The trial judge excluded the transcript. The Maryland Court of Appeals affirmed the exclusion, finding that the State originally offered the testimony at the Kanaras trial to rebut Kanaras' testimony regarding his participation in drug deals. *See Huffington*, 500 A.2d at 274. For this reason, the Court of Appeals held that the State did not possess a sufficiently similar motive to develop the testimony of Rassa at Kanaras' trial as it would at Huffington's trial, and thus the trial court had properly excluded the transcript. *See Huffington*, 500 A.2d at 277–79.

▮ Huffington initially contends that Maryland law required admission of the transcript. That argument must fail. The Maryland Court of Appeals has already directly ruled to the contrary. A federal court on habeas review of a state conviction will not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

▮ Alternatively, Huffington asserts that federal constitutional principles require admission of the transcript. Huffington relies on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). In those cases, the Supreme Court held that, to prevent a defendant from being deprived of a fair trial, the Due Process Clause required admission of exculpatory confessions by third parties—even if otherwise excludable on the basis of state evidentiary rules—where the evidence is "highly relevant to a critical issue" in the case, *Green*, 442 U.S. at 97, 99 S.Ct. at 2151, and sufficient indicia of reliability exist. *See id.; Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049.

Huffington insists that Rassa's testimony bore sufficient indicia of reliability, including: Rassa testified under oath at Kanaras' trial; the State credited his testimony, offering Rassa as a witness at that time; Kanaras' attorney subjected Rassa to extensive cross examination; and Rassa made a consistent corroborative statement to a friend, Paul Vela. Huffington also claims that Rassa presented evidence "crucial" to his case:

> The transcript of Rassa's testimony would have revealed to the jury that on May 20, 1981, Rassa and Kanaras approached the Hudson–Becker trailer together; Kanaras reached for a gun and a knife; Rassa was convinced that Kanaras intended to rob and kill Hudson; and Rassa had to dissuade Kanaras from carrying the weapons into the trailer. Rassa's prior testimony would also have informed the jury of Kanaras' prior drug debts to Hudson.

Brief of Petitioner at 39.

We find Rassa's testimony neither as reliable nor as compelling as Huffington suggests. As to reliability, we note that Rassa testified that *he*, not Kanaras, first brought up the subject of robbing Hudson, and that he lied to the police about this detail. Moreover, at the time Rassa allegedly formed his opinion that Kanaras intended to rob and kill Hudson, Rassa was under the influence of methamphetamines, marijuana, and alcohol. In fact, Rassa testified that he abused LSD, PCP, and cocaine, both around the time of the incident with Kanaras and even within a few weeks of his testimony at the Kanaras trial.

Similarly, the statement Rassa made to Paul Vela bears little corroborative value. Rassa did not mention to Vela the alleged willingness of Kanaras to kill Hudson or that Kanaras possessed a gun or knife at the time, both central elements of Rassa's later testimony. Moreover, Rassa made the alleged statement to Vela after Rassa and Vela learned of the murders from the media. Finally, Rassa has admitted that he told his story to the police in part because he feared Kanaras would implicate him. Unlike the statements at issue in *Chambers* and *Green*, Rassa's statement to the police was not against his penal interest, but decidedly in favor of it. *Cf. Cunningham v. Peters*, 941 F.2d 535, 540–41 (7th Cir.1991) (defendant not denied a fair trial under *Chambers* analysis where hearsay confession excluded because circumstances surrounding confession indicated a possible ulterior motive, and tim-

ing and sequence of events undermined its reliability). These facts hardly instill confidence in the reliability of Rassa's prior testimony.

Furthermore, unlike the testimony at issue in *Chambers* and *Green,* Rassa's testimony does not "directly affect[ ] the ascertainment of guilt." *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. Rather, it is "far more attenuated" in its connection to Huffington's guilt or innocence. *United States v. Fowlie,* 24 F.3d 1059, 1069 (9th Cir.1994). Rassa's testimony does not tend to exculpate Huffington as the testimony in *Chambers* and *Green* did. Instead, to the extent it would have any effect, it would work to impeach the credibility of Kanaras' testimony regarding his role in the crimes. *See Turpin v. Kassulke,* 26 F.3d 1392, 1395–97 (6th Cir.1994) (court should consider the extent to which evidence exculpates the accused when undertaking a *Chambers* analysis); *cf. Buchanan v. Angelone,* 103 F.3d 344, 349 (4th Cir.1996) (the "narrow exception recognized by *Green* " did not apply where the evidence excluded did not "strongly tend[ ] to show that the defendant was innocent" as in *Green* ), *aff'd,* —— U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

Both in his brief and at oral argument, Huffington contends that no difference exists between exculpatory and impeachment evidence as it pertains to the due process analysis under *Chambers* and *Green.* We note, however, that Huffington does not cite a single case in which any court has applied the *Chambers* and *Green* analysis to hold that the exclusion of impeachment evidence violated the Due Process Clause. When questioned at oral argument, Huffington pointed to *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Love v. Johnson,* 57 F.3d 1305 (4th Cir.1995). These cases, however, do not deal with a *Chambers* situation. Rather, they concern denial of due process where the government suppressed or concealed the impeachment evidence. We do not hold here that only direct, exculpatory—as opposed to impeachment—evidence satisfies the *Chambers* and *Green* requirements. But we do hold that, under the facts of this case, the impeachment evidence at issue lacks both the vitality and the reliability required by these cases even if impeachment evidence would suffice.

## B.

Finally, Huffington challenges Maryland's system of discretionary appeals for claims of ineffective assistance of counsel. He asserts that this system violated his equal protection rights because it denied him any state appellate review of his claim, either directly or by postconviction application. Huffington argues that "there is no principled ground for denying appellate review to ineffective assistance claims while granting it for Fourth and Fifth Amendment claims." Brief of Petitioner at 47.

Our recent opinion in *Hunt,* 57 F.3d at 1327, squarely forecloses this argument. We stated there that Maryland "has a legitimate interest in conserving judicial resources and need not provide the same review for each type of claim, particularly when Maryland already provides defendants with more than the constitutional minimum of opportunities for review." *Id.* at 1336–37. Nothing Huffington suggests convinces us otherwise. A system of discretionary review, of necessity, contemplates that the courts will at times exercise their discretion not to review a defendant's claim.

## IV.

For the foregoing reasons, the district court's denial of habeas relief is

*AFFIRMED.*