UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHARLES WALKER,
            *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
            *Respondent-Appellee.*

No. 03-11

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-99-952-1)

Argued: December 3, 2003

Decided: January 22, 2004

Before WILKINSON and NIEMEYER, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion,
in which Judge Wilkinson and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Paul MacAllister Green, Durham, North Carolina; Jonathan Lee Megerian, MEGERIAN & WELLS, Asheboro, North Carolina, for Appellant. Jonathan Porter Babb, Sr., Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Coo-

per, Attorney General of North Carolina, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appel-
lee.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

NIEMEYER, Circuit Judge:

Charles Walker is under a sentence of death for his conviction in
a North Carolina state court for first-degree murder.

In this appeal from the district court's order denying his petition for
a writ of habeas corpus, filed under 28 U.S.C. § 2254, Walker con-
tends that decisions of the North Carolina state courts relating to his
conviction involved unreasonable applications of federal law by (1)
failing to instruct the jury on the lesser included offense of second-
degree murder, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980),
and (2) declining to grant a new trial based on the prosecution's sup-
pression of one version of a witness' two statements given to the
police, in violation of *Brady v. Maryland*, 373 U.S. 83 (1965). He also
contends that in several respects he received ineffective assistance of
counsel, in violation of *Strickland v. Washington*, 466 U.S. 668
(1984). By order dated October 1, 2003, we granted Walker a certifi-
cate of appealability on these issues. For the reasons that follow, we
affirm the judgment of the district court.

I

Charles Walker lived with his girlfriend Pamela Haizlip in her
apartment in the Morningside Homes Housing Project in Greensboro,
North Carolina. On August 12, 1992, Walker and Haizlip, as well as
fellow Housing Project residents Jesse Thompson, Rashar Darden,
Antonio Wrenn, Sabrina Wilson, and Nicki Summers, were gathered

at Summers' apartment, located directly across the parking lot from Haizlip's apartment. Thompson, Wrenn, and Darden worked for Walker selling drugs. When Wrenn saw Tito Davidson nearby, the group discussed how Davidson attempted to rob Haizlip's apartment the night before, where Haizlip typically kept $4,000 to $5,000 in drug money. Walker told Haizlip to lure Davidson to her apartment, open the back door, turn the radio on, and keep Davidson there. He told Haizlip that Thompson and Darden were going to beat Davidson up. Wilson and Darden heard Walker say that he was going to kill Davidson. Walker then pulled out a gun and put a clip in it before he, Thompson, and Darden, who was also armed with a gun, walked across the parking lot to Haizlip's apartment.

When Davidson had been lured into Haizlip's apartment and Thompson, Darden, and Walker had arrived, Haizlip slipped out and returned to Summers' apartment. Walker and Darden then pulled out their guns, ordered Davidson to the floor and tied his hands with duct tape and radio wire. Walker asked Davidson whether he had tried to rob him, and Davidson said he "didn't know nothing about that." Walker then taped Davidson's mouth shut and struck him three times in the kneecaps with a hammer; Davidson's screams were muffled by the duct tape. Walker then handed Thompson his handgun and left the apartment. While Walker was gone, Thompson sliced Davidson's throat with a Ginsu knife "about three times," and then shot Davidson in the finger and the arm with Walker's gun, muffling the sound with a pillow. Darden too shot at Davidson with his gun.

During this entire period when Davidson was being cut and shot, Walker moved back and forth several times between Haizlip's apartment and Summers' apartment. Wrenn testified at trial that at one point, while he was in Summers' apartment, Darden and Thompson came to get him, saying that Walker, who was in Haizlip's apartment, wanted him. When Wrenn arrived at Haizlip's apartment, he saw Davidson, who was still alive, tied and bleeding, with knife wounds on his neck and bullet wounds on his body. When Davidson tried to say something to Wrenn, whom he knew, Walker asked Wrenn, "Ain't this Tito [Davidson]?" After Wrenn answered in the affirmative, he left the apartment. After some time had passed and Davidson had not yet died, Darden, too, left the apartment and went to Walker, who was now at Summers' apartment, to tell Walker, "He ain't

dying." According to Darden, Walker then accompanied him back to Haizlip's apartment, asked Thompson for the gun, and shot Davidson in the neck, finally killing him.

After Davidson had been murdered, Wrenn and Walker went to a nearby hardware store to purchase trash bags and cleaning supplies. Darden, Thompson, and Walker wrapped Davidson's body in a sheet and trash bags, carried it outside, and dumped it into a dumpster. Darden and Thompson then cleaned up the blood in Haizlip's apartment.

Walker, Haizlip, Wrenn, Darden, and Thompson were subsequently arrested for Davidson's murder. While in jail awaiting trial, Haizlip sent several letters to Walker. She wrote that she knew Walker "didn't do nothing" and that she was "lying left to right" when she told police that Walker had murdered Davidson. She wrote that she had lied because she believed Walker was seeing another woman, and because "Jay was threatening me." She added in one letter, "[Y]ou say they're doing this [giving you the death penalty] because your past records. You must have had a bad past, Charles."

At Walker's trial, Haizlip testified for the government, telling as much about the circumstances of the murder as she knew. On cross examination, Walker's counsel sought to impeach Haizlip's testimony with the letters that she wrote to Walker. Counsel allowed Haizlip first to read the letters to herself silently to refresh her recollection. He then questioned her about them, and she acknowledged that she "told [Walker] that I told some lies on him." Counsel then introduced the letters into evidence and had Haizlip read from them. On redirect examination, the government asked Haizlip about the passage in which she referred to Walker's "bad past," and Haizlip said that it referred to "an attempted murder charge," about which Walker had told her earlier.

The trial judge instructed the jury on first-degree murder only, and the jury found Walker guilty. At the separate sentencing hearing, Walker's counsel did not mention, as a nonstatutory mitigating factor, the uncertainty over whether Walker actually fired the fatal shot. The judge, however, told the jury that "all of the evidence relevant to your recommendation has been presented. . . . All of the evidence which you hear in both phases of the case is competent for your consider-

ation in recommending punishment." On their sentencing form, the jury answered "No" to the question whether Walker delivered the fatal shot. They found, however, that Walker intended to kill the victim while acting in concert with others and sentenced him to death.

On appeal, the Supreme Court of North Carolina found that Walker received a fair trial that was free of prejudicial error, *State v. Walker*, 469 S.E.2d 919, 926 (N.C. 1996), and the Supreme Court of the United States denied Walker's petition for a writ of certiorari, 519 U.S. 901 (1996).

After exhausting available North Carolina post-conviction procedures, Walker filed this petition for a writ of habeas corpus in the district court, and the district court denied relief. This appeal followed.

II

Walker contends first that the State trial court's failure to instruct the jury on second-degree murder was an unreasonable application of the rule articulated in *Beck v. Alabama*, 447 U.S. 625 (1980) (holding that in capital cases due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction).

The standard for collateral review of state proceedings under 28 U.S.C. § 2254(d) is now familiar. A federal court may not grant a writ of habeas corpus unless the State court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This criterion is satisfied when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). But "[a]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412.

Because *Beck* requires that a State trial judge instruct the jury on second-degree murder in a capital case "when the evidence warrants such an instruction," *Hopper v. Evans*, 456 U.S. 605, 611 (1982), we

must look to North Carolina law to determine what evidence would distinguish capital murder from second-degree murder.

Under North Carolina law, first-degree murder is "the unlawful killing of a human being with malice, premeditation, and deliberation." *State v. Nicholson*, 558 S.E.2d 109, 134 (N.C. 2002). "Premeditation" means the formation of a specific intent to kill, however briefly before the act of murder, and "deliberation" means the formation of such intent "not in the heat of passion, but while the defendant is in a 'cool state of blood.'" *Id.* The elements of first-degree murder include the lesser offense of second-degree murder, which requires only malice, but not premeditation or deliberation. *State v. Watson*, 449 S.E.2d 694, 699 (N.C. 1994).

At Walker's State trial, the court instructed the jury only on first-degree murder. Therefore, we must determine whether, in light of *Beck* and of the evidence before the State trial court, the State trial court's decision not to give an instruction on second-degree murder as a lesser included offense involved an unreasonable application of *Beck*. The State presented overwhelming evidence of Walker's intent to kill Davidson. Every one of the four witnesses to the events preceding the murder — Wilson, Haizlip, Darden, and Wrenn — testified that Walker instructed Haizlip to lure Davidson into her apartment and keep him there. In addition, Wilson witnessed Walker pull out a gun and put a clip in it before departing for Haizlip's apartment, where the murder took place, and both Wilson and Darden heard Walker expressly say that he was going to kill Davidson. Darden testified that he himself understood and intended that he and his companions, including Walker, were going to Haizlip's apartment to kill Davidson. Moreover, all of the witnesses agreed that the murder itself was a prolonged crime, with Davidson slowly dying from various wounds that included throat-slashings and bullets to the body, leaving little room for the argument that his death was unintended. Finally, all the witnesses testified to Walker's participation in the clean up of the murder scene and the disposal of the body. There was no evidence that Davidson's murder was committed with an intent other than one characterized as premeditated and deliberate. We conclude therefore that the State trial court did not unreasonably apply *Beck* in refusing to give a second-degree murder instruction in light of the evidence presented at trial.

Walker argues that Haizlip's testimony that Walker said that his friends were "gonna beat [Davidson] up" undermined the testimony of Darden and Wilson that Walker expressed an intent to *kill* Davidson and therefore created a conflict in the evidence on intent. Haizlip's testimony, however, does not indicate that Walker did not intend to kill Davidson, and the North Carolina Supreme Court expressly found no conflict in the evidence that Walker deliberately intended to kill Davidson. *See Walker*, 469 S.E.2d at 922. Rather, the evidence must be taken that Walker intended both to beat up Davidson and to kill him. And indeed the evidence supports the finding that Walker did just that. Walker, Darden, and Wilson beat Davidson with a hammer, and then they killed him. Rather than conflict with the testimony of Darden and Wilson, Haizlip's testimony simply elaborates on Walker's intent and confirms exactly what happened.

Walker also argues that there was an inconsistency as to what precise acts in the course of murdering Davidson he committed and what acts were committed by Darden and Thompson. This argument, however, does not go to whether Walker acted with premeditation and deliberation, the elements that separate first-degree murder from second-degree murder, but to the question of whether Walker was guilty of murdering Davidson at all. Indeed, for this reason it serves to further substantiate the trial court's decision because it supports the notion that as long as the jury believed that Walker killed Davidson, there was no question but that he did it with the intent required for first-degree murder.

Because the record contains no evidence tending to undermine the State's overwhelming evidence of premeditation and deliberation and therefore to suggest the need for an instruction on second-degree murder, we conclude that the trial court did not unreasonably apply *Beck* in instructing the jury only on first-degree murder.

### III

Walker also contends that the North Carolina courts unreasonably applied *Brady v. Maryland*, 373 U.S. 83 (1965) (holding that the Due Process Clause requires the government to produce to the defendant evidence favorable to the defendant), by refusing to grant him a new trial based on the prosecution's suppression of a statement orally

given by Marquita Schofield to a police officer which he contends was favorable to him. A new trial would be required under *Brady* if Walker were able to show that the evidence was (1) favorable to him; (2) known to the government but not to the defense; and (3) "material" in that there was a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Brady*, 373 U.S. at 87-88.

On September 30, 1992, more than a month after the murder of Davidson, Marquita Schofield approached a police officer at the housing complex and relayed a conversation that she had had with Thompson, in which Thompson had said that Davidson had tried to rob Haizlip and Walker, and that Thompson, after hearing of the attempted robbery, confronted Davidson, asking him, "Are you the one trying to rob us?" As related by Schofield, Thompson then said that he "bust [Davidson] twice," meaning that he shot him twice, and told him, "That's for my man 'Black,'" a friend of Thompson who was shot at Haizlip's apartment a few days before Davidson's murder. According to Schofield, Thompson also told her that after he shot Davidson, Walker "told [Thompson] he was crazy."

A few weeks later, on October 19, 1992, Schofield repeated the statement in writing, and this second statement was substantively identical to the first one recorded by the police officer on September 30, except that Schofield's handwritten statement failed to include Thompson's statement that Walker said that Thompson was "crazy."

At trial, the government provided Walker with Schofield's October 19, 1992 handwritten statement but not the earlier report given to a police officer in September 1992. The State trial court found that Schofield's first statement was "substantially consistent with and merely cumulative to" her second statement and therefore concluded that the government's failure to produce this evidence was not material.

Walker argues that the difference between the statements was vital because Schofield's first statement that Thompson told her Walker said Thompson was "crazy" was material to the question of Walker's level of involvement in the murder. If we accept Walker's contention

that this evidence might be construed to be favorable to Walker, it was nevertheless not unreasonable for the North Carolina courts to have concluded that its suppression did not present a "reasonable probability" of affecting the trial's outcome. With all the government's evidence showing Walker's specific intent to kill Davidson, as well as the fact that Thompson was subordinate to Walker as a drug runner, it was not unreasonable to conclude that Thompson's report that Walker said he was "crazy" would not have had a reasonable probability of affecting the jury's verdict that Walker killed Davidson. Describing a person as "crazy" could have several different meanings in this context, among them "maniacal" and "ruthless." Such an interpretation would be entirely consistent with the remainder of Thompson's statement to Schofield, in which Thompson bragged about how merciless he was in avenging the wrongs for which he imagined Davidson responsible. With the ambiguity in Thompson's statement, combined with the State's overwhelming evidence that Walker intended to kill Davidson and directed his subordinates to aid him in doing so, the difference between the disclosed and undisclosed versions of Schofield's testimony could reasonably be found to have had no impact on the outcome of the trial, and we therefore cannot conclude that the State court's decision in not ordering a new trial was an unreasonable application of *Brady*.

IV

Finally, Walker claims that he received ineffective assistance of counsel at trial. To carry his burden on this claim, Walker must show (1) "that [his] counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Walker argues that counsel made four unprofessional errors that violated the *Strickland* standard.

A

First, Walker contends that his counsel's failure to locate and interview Marquita Schofield was professionally unreasonable. His counsel and the law clerk in counsel's office submitted affidavits indicating their efforts to locate witnesses, including Schofield, and

their inability to find Schofield. The inability to locate witnesses after reasonable efforts does not constitute ineffective assistance of counsel. *See Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998). In addition, there is no reasonable probability that Schofield's testimony would have affected the outcome of the proceedings. At most, Schofield could have reiterated what Thompson told her in the statement she gave to the police. Thus, Walker has failed to satisfy both prongs of the *Strickland* test.

B

Walker next contends that his counsel acted in a professionally unreasonable manner by introducing into evidence the letters written by Haizlip to Walker while the two were in jail pending trial.

In these letters, Haizlip stated that she knew Walker "didn't do nothing" and that she was "lying left to right" when she told the police he had murdered Davidson. Accordingly, these letters served an important purpose in Walker's defense, particularly in a trial without substantial physical evidence. Haizlip was one of four witnesses who was vital to the government's case, and by producing letters of one of those witnesses stating that she was lying, counsel for Walker legitimately hoped to create a reasonable doubt as to whether these witnesses were pinning murder on Walker for their own reasons.

One of the letters, however, contained a passing reference to Walker's "bad past," through which the prosecution elicited from Haizlip the testimony that Walker had told her of a past charge for attempted murder. Although evidence of this past conduct was unfavorable to Walker, it was the strategic price paid by Walker's counsel to introduce the evidence helpful to Walker's case. Strategic decisions of this kind are not a basis for finding professional incompetence, especially when counsel's decision "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

C

Walker also contends that his counsel was ineffective in failing to cross examine Antonio Wrenn on the question of whether Wrenn and

Walker had taken a cab to the hardware store to purchase supplies to dispose of Davidson's body and to clean the apartment. This detail, however, is insubstantial and presents no reasonable probability that questioning Wrenn on this point would have changed the outcome of the proceedings.

D

Finally, Walker contends that his counsel was incompetent in failing to propound as a non-statutory mitigating factor at sentencing the possibility that Walker did not personally kill Davidson.

While defense counsel has an obligation to investigate possible mitigating factors in preparation for a capital sentencing hearing, *Williams*, 529 U.S. at 395-96, counsel did bring to the jury's attention in the guilt/innocence portion of the trial the argument that Walker was not the person who fired the fatal shot. Indeed, the question of whether the State had proved that Walker fired the fatal shot was resolved by the jury when it answered "No" to that question on the sentencing form. In addition, the trial judge instructed the jury to "consider any other circumstance . . . arising from the evidence which you deem to have mitigating value." The jury was conscious of the fact that Walker did not fire the fatal shot — indeed it could not conclude unanimously that he did — and it was instructed by the judge to consider such evidence if the jurors thought it tended to mitigate Walker's guilt. Any failure, therefore, to present explicitly the fact that Walker did not fire the fatal shot during sentencing had no reasonable probability of affecting the outcome of the sentencing hearing.

V

For the foregoing reasons, we affirm the district court's order denying Walker's petition for a writ of habeas corpus.

AFFIRMED